[Crim. No. 1742. Third Appellate District.—October 29, 1940.]

THE PEOPLE, Respondent, v. ELMER SOULES, Appellant.

T. F. Peterson and H. William Ott for Appellant.

Earl Warren, Attorney-General, and J. Q. Brown, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The defendant was tried and convicted by a jury of the crime of murder of the second degree for shooting and killing Wesley Henry. From the judgment which was accordingly rendered this appeal was perfected.

The defendant, Elmer Soules, owned and operated the Buckhorn Service Station near Blue Lake in Humboldt County. He slept in a bedroom adjacent to the gas station. A young man by the name of Charles Sellers worked at the gas station for the defendant and shared his bedroom with him. The deceased, Wesley Henry, had lived in that vicinity for many years. He and the defendant had been acquainted for more than a year. They occasionally associated together in a friendly manner. No trouble had ever existed between them. Prior to the homicide Henry was licensed to carry a revolver. We assume that privilege was granted for a lawful purpose. He did not have the revolver in his possession at the time of the homicide.

About 7 o'clock on the evening of February 10, 1940, Mr. Henry visited the defendant's gas station to repair an automobile tire. Soules did not have the necessary tools with which to repair the tire, but he offered to take Henry in his machine to Blue Lake for the purpose of securing the necessary repairs. Before leaving the Buckhorn Service Station they drank liquor together from a bottle. They spent nearly the entire night drinking liquor together at various saloons in Blue Lake. They were on the friendliest of terms. No trouble arose between them. Mr. Henry voluntarily left

his revolver in the custody of a bartender at a saloon in Blue Lake. He did not have the weapon at the time of the homicide. Having spent the night drinking together, they returned to the defendant's gas station about 3 o'clock the following morning. Henry was somewhat under the influence of liquor. Soules did not show the effect of excessive drinking. When they arrived, the defendant left Henry asleep in his automobile and entered the bedroom where Charles Sellers was sleeping in a separate bed. Soules turned on the light and awakened Sellers, telling him that he had brought Henry home with him, but that he left him asleep in the parked car. Sellers suggested that it was a cold night and that Henry might freeze out there. The defendant then went out and brought Henry into the bedroom and urged him to take off his clothes and get into bed. Henry removed his boots and jacket and lay down on the defendant's bed. Soules sat down in a rocking chair situated seven or eight feet from the bed. He carried on a conversation with Mr. Henry for a few minutes. The subject of that conversation is not related, but it was not important, for no witness says there was any indication of controversy or ill will between them. After a short period of time the defendant told Henry to go to sleep. A little later he told him to move over so that he could get into bed. Mr. Henry promptly did so. The defendant remained seated in the chair. After a brief silence, the defendant, who may have been brooding over some imaginary wrong, said to Henry: "If you fool around here you will get filled full of shot." No cause for that threat appears in evidence. Henry made no reply. Charles Sellers, who was the only living eye-witness to the affair, except the defendant, declared that he had related everything of importance that occurred at that time. He gave no reason for the defendant's threat to fill Henry full of shot. A few moments later, without provocation, the defendant arose and crossing the room he picked up a loaded shotgun from behind the kitchen door, and returning to the chair he again seated himself, holding the gun across his knees and pointing it toward the bed where Henry lay with his back toward him. The same threat was repeated without any response. Mr. Sellers then asked the defendant if the gun was loaded. He said, "You're darned right, it's loaded." Sellers then advised the defendant not to fool

around with a loaded gun. Soules replied that he was not fooling. In the meantime the defendant sat in the chair with his finger on the trigger and the gun pointed in the direction of Mr. Henry as he lay with his back toward Soules. Finally, Henry turned over after several such threats had been made and started to get up, remarking that he did not like that kind of talk and that he would take that gun away from him. Henry sat on the edge of the bed and pulled on his boots. Then he stood up and staggered around to get his balance. Apparently he was somewhat intoxicated. He took a short step or two in the direction of Soules as he still sat with the gun, in the rocking chair. As Henry got on his feet, the defendant declared that "Nobody is going to take this gun away from me." He promptly fired, striking Henry in the abdomen. Henry fell to the floor and died within a few moments. The defendant stood looking at the form of his victim without saying a word. Sellers sprang from his bed, exclaiming, "My God, Red, what have you done!" The defendant remained silent for a few moments, and then replied, "I hated to do this but I had to." He did not suggest any reason why he had to shoot Henry. Upon the advice of Sellers, the defendant surrendered himself to the sheriff and made a statement of the affair, in which he corroborated Mr. Sellers' story in most of its details. He said that Henry was drunk and that he put him to bed. He claimed that he insisted on Henry taking off his clothes, which he refused to do. He admitted that there was "no quarrel" between them, but he said that when he told Henry to get up and take off his clothes he "jumped up all of a sudden" and said "he was going to clean up on me". That statement was not corroborated by Sellers. The defendant said he was afraid of Henry, but he gave no reason for that pretended fear. He certainly did not fear him enough to get out of the rocking chair in which he sat when' the deceased arose from the bed. Soules admitted that he was sitting in the chair when he shot the deceased. There was nothing in Henry's previous conduct to lead the defendant to fear him. While the deceased was still lying in bed with his back to the defendant, and before Henry had said a word, Soules got up and armed himself with a loaded shotgun and returned to the chair where he sat with it pointed toward the bed and with which he threatened to

shoot the deceased. Mr. Henry was unarmed, as the defendant knew. He had made no previous threats or demonstrations against the defendant. Clearly the defendant was in no danger. As a reasonable person, he must have known that fact. The killing of Wesley Henry appears to have been an unprovoked and unjustifiable homicide.

The only circumstance that might mitigate the killing of Henry is the possibility that the defendant may have been drunk. But he does not claim that he was then drunk. His sole pretense of an excuse was that he had to shoot in necessary self-defense. Sellers testified that he acted and talked like a sober man. The jury was fully instructed upon the legal effect of intoxication. It was the sole province of the jury to determine whether the defendant was drunk or sober. The verdict implies that the jury did not believe the defendant was so intoxicated as to mitigate the crime of killing Wesley Henry. There is an abundance of evidence to support that conclusion.

The appellant seeks a reversal of the judgment on the grounds that (1) The court erred in giving to the jury and in refusing to give certain instructions; (2) The court erred in excluding defendant's offer to prove that the deceased was a dangerous man by showing he was guilty of former acts of violence against other persons, and (3) The district attorney was guilty of prejudicial misconduct in his argument to the jury.

The court properly rejected defendant's offer to prove that the deceased was a dangerous man of violent temper by evidence of former unprovoked assaults upon other individuals. He had previously been permitted to testify that the general reputation of the deceased for peace and quiet was "not too good". The defendant was then asked if he had heard of specific instances when the deceased assaulted other persons. Upon request of the court to indicate more specifically the nature of the evidence sought to be elicited, the defendant's attorney offered to prove that his client had heard that Wesley Henry, the deceased, assaulted Caesar Pido with a rock; that upon another occasion he threatened to blow a hole in Frank Williams "big enough to ride a horse through", and that, at another time, he "had discharged a gun and blown a man's heel off". To that offer the prosecution objected on the ground that the evidence was

incompetent. The objection was properly sustained. No sufficient foundation was laid for the introduction of evidence of former specific acts of violence upon other persons. ■ Under the circumstances of this case the court was justified in exercising its discretion to reject the proffered evidence. The testimony of Charles Sellers, who was present at the time of the homicide, clearly indicates that the defendant was the aggressor and that there was no occasion for him to reasonably fear an assault or bodily harm at the hands of the deceased.

It is true that, in some jurisdictions, under proper circumstances, evidence of prior specific acts of violence by the defendant upon other individuals may be shown in a subsequent trial for murder where the accused admits the homicide and first establishes a *prima facie* case of necessary self-defense. Evidence of prior acts of violence by the deceased upon other persons, of which the accused has previous knowledge, is sometimes admitted, after proof that the defendant had knowledge *that the deceased previously threatened him,* on the theory that such evidence, in view of the former threats, would reflect some light on the question of whether the defendant killed his antagonist in the honest belief that he was about to receive great bodily harm at his hands. It is asserted, in support of the competency of such evidence of prior acts of violence against other persons, that knowledge of the fact that a person who had previously threatened the defendant, was a violent, turbulent and dangerous man, would furnish some cause for a man to reasonably assume that he was about to receive great bodily harm from him, and therefore justify killing him, provided the surrounding circumstances otherwise warranted that conclusion. In other words, it is argued that knowledge of the fact that an antagonist is a bad and dangerous man may reasonably increase one's fear of him.

■ It is, however, apparent that even if such evidence is competent, under certain circumstances, it should be received with caution for the reason that it is remote, weak, collateral to the real issue, confusing to the jury, unsatisfactory and difficult to rebut. To entitle such evidence to any substantial weight it would be necessary to adduce proof of the circumstances of each previous affray to fairly determine whether the deceased was warranted in acting as he

did. For those reasons the great weight of authority holds that evidence of such prior specific acts of violence by the deceased upon other persons is not admissible upon trial of a subsequent offense. It is almost uniformly held that proof of the turbulent, violent and dangerous character of a person, offered for the purpose of concluding therefrom that he was more likely to have been the aggressor in an affray which resulted in his death, must be established by evidence of his general reputation for peace and quiet in the community where he resides. The same rule is usually applicable to evidence of a violent nature adduced in assault and murder cases to corroborate the defendant in his claim that he acted in necessary self-defense, believing from the circumstances of the particular case, as a reasonable man, that he was about to be assaulted and that he was likely to be killed or to receive great bodily harm. (*People* v. *Griner,* 124 Cal. 19 [56 Pac. 625]; *People* v. *Henderson,* 28 Cal. 465; *State* v. *Sella,* 41 Nev. 113 [168 Pac. 278, 285]; 25 Calif. Law Rev. 459, 467; 121 A. L. R. 382, note; 26 Am. Jur. 393, sec. 347; 13 Cal. Jur. 693, sec. 77; 30 C. J. 230, sec. 467.)

█ There are certain well-recognized exceptions to the rule that evidence of previous acts of violence by the deceased against other persons may not ordinarily be shown. Such evidence is competent when it is a part of the *res gestae* of the transaction for which the defendant is being tried. (121 A. L. R., p. 390, subd. III [a] note.) █ That evidence is also competent as proper cross-examination of a witness for the prosecution who has first testified that the deceased was a man of good reputation for peace and quiet, inferring thereby that he was therefore not likely to have assailed the defendant, or to have threatened his life. (*People* v. *Carmichael,* 198 Cal. 534, 547 [246 Pac. 62]; 30 C. J. 175, sec. 397.) In the authority last cited it is said in that regard:

"Deceased's character must be shown by general repute in the community and not by evidence of specific acts. But on the cross-examination of the state's witnesses defendant is entitled to inquire as to their knowledge or information with respect to deceased or other difficulties in which he was engaged, the purpose of which inquiry being to test their credibility or their knowledge of deceased's character."

It was the defendant in the present case who first offered evidence of the general reputation of the deceased for peace and quiet.

Many authorities hold that before evidence of prior specific acts of violence may be adduced, the defendant is required to make a preliminary showing of his good faith as a reasonable person in believing it was necessary for him to kill his assailant to protect himself against great bodily harm. ■ If it clearly appears that the defendant was the aggressor or that he was in no imminent danger of death or great bodily harm, evidence of prior acts of violence upon other persons by the deceased is not admissible. ■ The trial court has a sound discretion to determine from all of the facts and circumstances adduced whether a *prima facie* showing of good faith on the part of the defendant has been established sufficiently to warrant the reception of evidence of prior acts of violence upon other persons by the deceased. In 30 C. J., at page 230, it is said in that regard:

"In order that evidence of the violent and dangerous character of deceased or the person assaulted may be admissible, there must be a claim of self-defense, supported by some evidence. *It is within the discretion of the trial judge to determine when a proper foundation is laid,* which according to some authorities may consist in the testimony of defendant alone, but according to other authorities, the unsupported statement of defendant is insufficient. There must be some evidence of some overt act on the part of deceased, of such character as would *per se* be indicative of dangerous intentions, or it must be shown affirmatively to have been done under circumstances such as to have reasonably led to a belief that it was of that character. Evidence of the dangerous and violent character of deceased is not admissible where at the time such evidence is offered it appears from the evidence already introduced that the defendant provoked the difficulty, or was the assailant, where he was in no danger of loss of life or serious bodily harm, or did not believe himself to be in such danger, or there was nothing to excite the fears of a reasonable man that such danger existed."

In the case of *People* v. *Swigart*, 80 Cal. App. 31 [251 Pac. 343], it was held the court did not err in excluding evidence on behalf of the defendant in a trial for murder, that the

deceased had previously violently struck and beaten other individuals. That ruling was unquestionably correct. It appeared that the defendant had no personal knowledge of such alleged acts of violence before the time of the homicide. Any previous acts of violence by the deceased could therefore have had no bearing on the question as to whether the defendant acted in necessary self-defense in killing his adversary, honestly believing in good faith that he was about to receive great bodily harm at the hands of a violent and dangerous man. The court did say that *under proper circumstances* such evidence of specific acts of violence on the part of the deceased might be shown. But the court adopted the reasoning usually employed to indicate that such evidence is either incompetent or that it should be received with great caution after a foundation for its acceptance had first been laid. The court added that, ''The courts of our own state have not as yet gone as far in applying the character rule in instances such as we have here as counsel for the defendant would have us go.'' The judgment in the Swigart case was affirmed on the ground that the defendant was the aggressor and that he did not kill the deceased in necessary self-defense. The defendant knew that the deceased had threatened to kill him. He deliberately armed himself with a revolver and went to a place where he expected to meet the deceased. He met him there, and, in an affray which ensued, he killed the deceased.

In the case of *People* v. *Thomson,* 92 Cal. 506 [28 Pac. 589], a judgment of conviction of murder of the first degree was reversed because an erroneous instruction, which was given to the jury, confined evidence that the deceased had frequently threatened the life of the defendant with a deadly weapon which he exhibited, to the sole consideration of the question as to whether ''the relations existing between the deceased and the defendant were unfriendly''. The Supreme Court held that the evidence in that case tended to show that the defendant, *having been frequently threatened by the deceased,* acted, under the circumstances of that case in good faith in his belief that he was about to receive great bodily harm at the hands of his assailant when he shot and killed him. The evidence showed that at the time of the homicide the deceased advanced toward the defendant ''three or four steps, *with a pistol raised in his hands''.*

In a prosecution for murder, where the accused relies on the doctrine of necessary self-defense, and offers proof of prior threats of the deceased to kill him, and the evidence shows that the deceased was actually advancing with a revolver in his hand toward the defendant at the time of the homicide, the jury is entitled to consider *the evidence of prior threats* to determine whether the defendant, as a reasonable man, was warranted under such circumstances in believing that he was about to be killed or to receive great bodily harm so as to justify him in shooting his assailant in necessary self-defense. There is nothing in the Thomson case in conflict with what we have said regarding the principle of excluding evidence of prior acts of violence against another person, under the circumstances of this case. In the present case no threats against the defendant were ever made by the deceased. No case in California, to which our attention has been called, upholds the contention that evidence of prior specific acts of violence of the deceased against other individuals is competent under such circumstances as are shown by the record in this case.

None of the cases relied upon by the appellant furnishes authority in support of his contention that the court erred in refusing to permit him to prove former specific acts of violence by the defendant upon other persons, under the circumstances of this case.

The case of *People* v. *Pantages*, 212 Cal. 237 [297 Pac. 890], was reversed for the reason, among others, that the court erred in precluding the defendant from showing on cross-examination of the prosecution's witness that his testimony was biased and false because the prosecuting officer promised him, or intimated, that he would be dealt with leniently in the prosecution of several indictments which were then pending against the witness. That rejected evidence was addressed to the veracity of the witness, and it was therefore competent. That case has no application to the principle under discussion in the present case.

In *People* v. *Blackwell*, 81 Cal. App. 417 [253 Pac. 964], it was held to be error to sustain an objection to the question propounded on cross-examination to a witness of the prosecution to elicit evidence that, in consideration for her testimony against the defendant, the prosecuting officer had agreed to dismiss a criminal charge which was then pending

against her. Like the Pantages case, *supra,* that question also affected the credibility of the witness. It was certainly competent. But it has no bearing on the question involved in this case respecting the rejecting of the offer to prove former specific acts of violence of the deceased upon other persons.

The case of *People* v. *Bennett,* 79 Cal. App. 76 [249 Pac. 20], upon which the appellant relies, was determined on exactly the same situation previously mentioned in the two last-cited cases. It has no application to the issue under consideration. There is nothing in any of the cases relied upon by the appellant in conflict with what we have previously said with respect to the incompetency of evidence of former specific acts of violence by the deceased against other persons.

Clearly that evidence was not competent under the circumstances of this case. No adequate preliminary foundation for its reception in evidence was established. The record almost conclusively shows that the defendant did not fear bodily harm at the hands of the deceased; that he had no occasion to fear him, and that he did not kill him in necessary self-defense. ■ Every circumstance of the case refutes the defendant's claim that he acted in necessary self-defense. The testimony of an impartial eye-witness to the entire affair leaves no reasonable doubt that the defendant was the aggressor and that he deliberately armed himself with a loaded shotgun with which he killed an unarmed and intoxicated man without justification or cause. The defendant had no cause to fear the deceased. He had known him for more than a year. He associated with him. He knew that he was unarmed. He spent the night drinking with the deceased on the friendliest of terms. He was so friendly with Wesley Henry that he brought him home, took him into his own bedroom and put him to sleep in his own bed. When the defendant asked Henry to move over so that he could get into bed he obediently did so. Charles Sellers, the unprejudiced eye-witness to the entire affair, related a story from which we must conclude the deceased said and did absolutely nothing that could be construed as a threat against the defendant. The circumstances indicate that the killing of Wesley Henry was prompted by an abandoned and malig-

nant heart, which infers that it was the result of malice. (Sec. 188, Pen. Code.)

The foregoing facts refute the theory of a homicide committed in necessary self-defense, or that the defendant shot and killed Wesley Henry in the belief that he was in danger of then receiving great bodily injury. No preliminary foundation was furnished for the introduction of evidence of former specific acts of violence by the deceased upon other persons. The court did not err in refusing to permit that proffered testimony under the circumstances of this case.

 It is contended the court erroneously charged the jury that:

"If you believe from the evidence in this case to a moral certainty and beyond a reasonable doubt that the defendant, Elmer Soules, at the time and place alleged in the information, did wilfully, unlawfully, feloniously, and with malice aforethought, kill and murder Wesley Henry, and that said killing was not wilful, deliberate and premeditated, it is your duty to find the defendant guilty of murder in the second degree."

It is asserted the foregoing instruction is contradictory and misleading for the reason that it infers that the defendant might be convicted of murder of the second degree even though he did not *wilfully* kill his adversary. The jury was very fully instructed upon every essential element of the crime of murder of the first and second degree and of manslaughter. After the jury retired and considered their verdict for some time, they returned into open court and asked the judge to further explain the difference between murder of the first degree and murder of the second degree. The foreman said:

"We would like a clearer explanation as to the difference between murder in the first degree carrying the death penalty and murder in the second degree."

The court then reread its instructions upon that subject which had been previously given to the jury. Finally the court said:

"If the killing is wilful, deliberate and premeditated it is murder in the first degree; if it is not wilful, deliberate and premeditated then it is murder in the second degree, *pro-*

*vided, of course, that it is wilful, unlawful, felonious, and with malice aforethought."*

We are of the opinion the instructions explaining the distinction between murder of the first and second degrees were not misleading or prejudicial. The jury was clearly and repeatedly told that murder of the second degree is accomplished when *"it is wilful,* unlawful, felonious and *with malice aforethought".* That was the last statement the judge made to the jury. It would seem improbable that the jurors could have misunderstood that plain statement of the law. In effect, the court instructed the jury that unless the killing was accomplished *wilfully* it would not constitute murder of the second degree, nor murder of any degree. The jury was correctly told that malice, either express or implied, must be shown to have existed on the part of the defendant to constitute either murder of the first or the second degree. The distinction between the two degrees of murder was plainly and properly declared to be the presence or the absence of *premeditation and deliberation.* It is true that the court said "if it is not wilful, deliberate and premeditated" it is murder of the second degree provided "it is *wilful,* unlawful, felonious and with malice aforethought". The word "wilfully" was properly defined in the exact language of section 1, subdivision 1, of the Penal Code. In the use of the phrase "if it is not wilful, deliberate and premeditated" the court employed words of a commonly-used phrase *conjunctively expressed.*

In the case of *People* v. *Pool,* 27 Cal. 572, 581, the Supreme Court held that the identical words which are challenged in this case, to wit: "wilful, deliberate and premeditated", when they are associated with the subject to which they relate, "may be regarded as cumulative, and merely giving force to the subject matter by successive expressions of the same idea". In support of that conclusion the court cited section 1084 of 1 Wharton's Criminal Law. The same construction of that term is likewise explained in 2 Bishop's New Criminal Procedure, page 234, sections 545, 546. In the present case we are satisfied the phrase was used in the conjunctive and that it must have been so understood by the jury, for the court followed that phrase immediately with the statement that second degree murder is accomplished only when "it is *wilful, . . .* and with malice afore-

thought''. We therefore conclude that the challenged instruction was neither erroneous nor prejudicial.

■ The appellant contends that the court erred in giving to the jury instructions on the subject of circumstantial evidence for the reason that the killing was admitted and that there was an eye-witness to the entire affair. It is asserted this rendered the instructions on that subject inapplicable. Assuming that the instructions on circumstantial evidence were inapplicable, it is not suggested how they could have prejudiced the defendant. We are unable to perceive how they could possibly have prejudiced him. ■ A multitude of authorities hold that even though inapplicable instructions are given to the jury regarding a subject upon which there is no evidence, it does not constitute reversible error unless it appears that the defendant was actually prejudiced thereby. (*People* v. *Tyren*, 179 Cal. 575, 580 [178 Pac. 132]; *People* v. *Wilt*, 173 Cal. 477, 484 [160 Pac. 561]; *People* v. *Ridgeway*, 89 Cal. App. 615 [265 Pac. 349]; art. VI, sec. 4½, Const. of Calif.; 17 C. J. 342, sec. 3690.) In the authority last cited it is said in that regard:

"The giving of instructions, whether correct or not, which are abstract *or are not authorized by the pleadings and evidence,* will not constitute a ground for reversal where no prejudice results to defendant. The presumption is that an instruction having no application to the case made by the pleadings and proof does not injure defendant."

In the present case, while the defendant did admit that he shot and killed the deceased, and there was an eye-witness to the immediate transaction of the shooting, the motive and intent with which the crime was committed were established by circumstances. We think the court properly instructed the jury with respect to the distinction between direct and circumstantial evidence. If the instructions are not applicable they were harmless. Certainly the giving of those instructions is not reversible error.

■ The court properly instructed the jury in the exact language of section 197 of the Penal Code to the effect that homicide is justifiable under the circumstances enumerated therein, but that when the defendant is the assailant or is engaged in mutual combat, he must in good faith endeavor to decline further struggle before he is justified in killing his antagonist. The appellant challenges that instruction on

the ground that he was not the aggressor and that he was not engaged in a mutual combat with the deceased. There is no merit in this contention. ▆ The homicide having been conclusively established, the burden of showing that it was justifiable rested on the defendant. (Sec. 1105, Pen. Code.) The chief excuse of the appellant was that he was compelled to kill Wesley Henry in necessary self-defense, believing he was about to receive bodily harm. The defendant first threatened to "fill the deceased full of shot". Substantial evidence indicates that the defendant was the aggressor. He deliberately armed himself with a loaded shotgun and sat in the chair, threatening to use it. He claimed that the deceased got out of bed and came toward him, threatening to take the gun away from him. Under such circumstances, the doctrine of declining to carry on the affray before the defendant could be excused from killing his antagonist on the ground of justifiable homicide is applicable and proper. The challenged instructions were not erroneous.

▆ In his opening statement to the jury the defendant's attorney, in commenting on the evidence he expected to adduce, said that the deceased threatened the defendant and started toward him acting "as if he had something to drink *just like any drunken Indian*". On motion of the district attorney the quoted portion of the statement was stricken from the record. That ruling was harmless. The defendant failed to assign it as error. The remark was disparaging to the character of the deceased. There is no evidence that he was an Indian. ▆ Moreover, there is no legal presumption that merely because a man may have some Indian blood in his veins he is therefore more dangerous under the influence of liquor than individuals of other nationalities. ▆ Section 22 of the Penal Code, which prescribes the legal effect of voluntary intoxication upon criminal acts, makes no discrimination with respect to race, color or nationality. All are governed by the same rule. The effect of liquor depends upon individual natures and personal characteristics, not upon the nationality of the consumers thereof. Some famous and exemplary Americans have been proud of their Indian blood and have brought honor to our nation.

▆ We have examined each assignment of alleged prejudicial misconduct of the district attorney in his argument

to the jury and find no substantial merit in any of them. The challenged statements appear to have been harmless. Moreover, they were stricken from the record and the jury was instructed to disregard them. Under such circumstances they may not ordinarily be relied upon as reversible error. (*People* v. *Berryman*, 6 Cal. (2d) 331 [57 Pac. (2d) 136]; *People* v. *Swearningen*, 168 Cal. 53, 58 [141 Pac. 822]; 17 C. J. 299, sec. 3638.)

We are not warranted in reducing the crime from murder of the second degree to that of manslaughter.

The judgment and the order are affirmed.

Tuttle, J., and Pullen, P. J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 28, 1940.