[Civ. Nos. 1119, 1120, 1121. Fifth Dist. May 18, 1970.]

In re JOSEPH G. et al., Persons Coming Under the Juvenile Court Law. TED L. SMITH, as Chief Probation Officer, etc., Plaintiff and Respondent, v. JOSEPH G. et al., Defendants and Appellants.

(Three Cases.)

COUNSEL

Martin Spiegel and Peter Haberfeld for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Arnold O. Overoye, Daniel J. Kremer and Marjory Winston Parker, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STONE, P. J.**—Petitions were filed in the Juvenile Department of the Superior Court in the County of Merced representing that the minors, Joseph G., Jesse C., and Johnny G., came within the provisions of Welfare and Institutions Code section 602 by reason of having violated Penal Code section 647, subdivision (f), disorderly conduct by being under the influence of intoxicating liquor, which the juvenile court found to be true, and Penal Code section 148, resisting arrest, which the court found to be untrue.

Appellants were found to come within the provisions of Welfare and Institutions Code section 602, and were adjudged wards of the court and placed on probation. All three cases arise out of the same transaction, the

facts and legal issues are identical, and they are considered as one on this appeal.

About 3:55 a.m. August 20, 1968, Officer Harold McKinney, while on patrol in the City of Livingston, was attracted by loud voices and observed appellants standing on a sidewalk next to a fence in front of the residence of Joe and Johnny. He pulled over to the curb and told the youths they were violating the curfew law and to "break it up" and go home. They advised him they were on private property and he could not touch them. McKinney got out of the car, approached the juveniles, concluded they had been drinking because of slurred speech and some staggering and weaving about. He also detected a strong odor of alcohol on the breath of two of the boys. The officer informed appellants they were not on private property, but on a public sidewalk, and requested Joe to perform a sobriety test by standing on one foot. As Joe attempted to comply, Johnny nudged him with his shoulder, pushing him off balance and against a fence, and all three boys laughed. Officer McKinney informed them they were under arrest for being under the influence of alcohol, and told them to get in the police car. They demurred; Officer McKinney radioed for assistance and when he received a reply that help was on the way, the three appellants entered the police vehicle.

During the trip to the police station and after arrival, Officer McKinney demanded of appellants their names and addresses, but they refused to comply, protesting noisily that they had been on private property and that there was no reason for the arrests. Deputy Sheriff Wisdom arrived at the police station in response to Officer McKinney's call for help, and observed appellants crowded around the desk yelling at Officer McKinney. Wisdom proceeded to forcefully seat appellants in chairs, over their objections and loud protestations. Wisdom testified at the jurisdictional hearing that all three appellants were under the influence of alcohol at that time.

Upon the arrival of Deputy Wisdom, McKinney ceased his attempt to obtain identification, and took the boys to the patrol car to be transported to the juvenile hall in the City of Merced. Both officers testified that all three appellants were weaving and unsteady on their feet as they walked to the car. Two of the boys entered without incident but the third, Johnny, refused to enter. When he was forcibly put in the back seat he refused to pull his feet inside the car and the officer had to raise his feet and push them inside. Appellants contend the officer started to shut the door before Johnny could get in and that he pushed the door open so it would not be slammed against his foot. One of the boys testified that the officer slammed the car door on Johnny's legs.

After locking the three in the back seat of the police car, the officers

returned to the police station momentarily to place a radio call. Officer McKinney heard the juveniles pounding on the windows and kicking the shield between the front and back seats of the police car, and went to the car to quiet them. He heard one of the boys yell that he had to go to the bathroom, and started to open the door but Johnny relocked it from the inside. This occurred three times before Officer McKinney succeeded in opening the door by reaching through the front window and forcing Johnny's hand from the lock button. Upon opening the car door, the officer was met by more verbal abuse and Jesse stated he was going to urinate in the car. The officer, because of the verbal abuse, closed the door.

The radio call completed, they proceeded to Merced, appellants all the while cursing Livingston police officers and high school officials, claiming prejudice against Mexican-Americans. Jesse said that if he had a gun he would shoot Officer McKinney between the eyes, and that they would "get" the officers when they were released.

They got out of the car in front of juvenile hall and were approaching the door when Jesse made a turning motion and stated, "I'm going to kill you." Officer McKinney grabbed Jesse and pinned him against the wall. Johnny, seeing what was happening, lunged at Officer McKinney but was grabbed and thrown to the ground by Deputy Wisdom. Joe, at this point, started toward Deputy Wisdom and Johnny, who were grappling on the front lawn, but was grabbed by Officer McKinney. The three youths were finally taken inside juvenile hall.

Appellants testified their reason for being out of doors at 3:55 a.m. was that they could not sleep because of the extreme heat, and rather than wake the occupants of the house they went outside to talk. Jesse testified that Officer McKinney said nothing about a curfew when he ordered them to go inside the house, and denied he stated he was going to kill Officer McKinney. As to appellants' testimony about drinking, Jesse admitted he had some beer at either 11 p.m. or midnight or 1 a.m., he could not remember when. Joe testified appellants had been drinking but were not drunk, and that he had three cans of beer that night.

The officers testified that after transporting appellants to juvenile hall, they discovered urine on the floor of the back seat of the car. Both Jesse and Joe denied any knowledge of any one relieving himself in the police car. Johnny did not testify at the hearing.

Appellants assert in their brief that the trial court erred in reading the probation officer's social study reports (*In re Gladys R.,* 1 Cal.3d 855 [83 Cal.Rptr. 671, 464 P.2d 127]) prior to the jurisdictional hearing. At oral argument counsel stated he had learned that this was a mistaken

assumption, that the court read only the jurisdictional report before the hearing. Even so, argue appellants, error resulted because the jurisdictional reports contained hearsay and opinion material in violation of their Sixth Amendment constitutional right of confrontation, as articulated in *Pointer v. Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].

As to statements in the reports attributed to the arresting officers, the question of *Pointer* is academic because both officers testified at the jurisdictional hearing and were subject to cross-examination by defense counsel concerning the contents of the report. The juvenile hall matron was not present at the hearing, but her hearsay statement in the reports presents no ground for reversible error because it was equivocal. Viewed in the light of the entire record, this aspect of the reports meets the *Chapman* test (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]) without question.

■ However, the jurisdictional reports concluded with the probation officer's opinion that each appellant was guilty and should be found guilty. We agree that a probation officer's opinion predicated upon hearsay is not evidence and should not be incorporated in the jurisdictional reports. ■ The bifurcated juvenile court procedure prescribed in Welfare and Institutions Code sections 701, 702 and 706, as explicated in *In re Gladys R., supra; In re Corey,* 266 Cal.App.2d 295, 296 [72 Cal.Rptr. 115]; and *In re Steven F.,* 270 Cal.App.2d 603 [75 Cal.Rptr. 887], is designed to provide a jurisdictional hearing at which competent evidence is adduced, and to make certain the juisdictional order is made *before* the social study report containing material irrelevant to the issue of guilt is considered. (*In re Gladys R., supra.*)

The probation officer's opinion and conclusion is necessarily predicated upon his knowledge of the entire case, including that contained in the social studies report, and it is also subject to the objection that it impinges upon the fact-finding province of the juvenile court judge. It would be anomalous, to say the least, for us to hold that the juvenile court judge cannot consider the social studies report in determining jurisdiction, yet the probation officer who prepares the social studies report may recommend to the judge how the jurisdictional issue should be determined. ■ In this case we find the impropriety of less than reversible dimensions, for several reasons. First, the judge did not read the social studies report containing the inadmissible material before making a jurisdictional determination. Second, no objection was made to the probation officer's conclusion at the time of the hearing, and opinion evidence, like hearsay evidence, is admissible where no objection is made. (*Russell* v. *Geis,* 251 Cal.App.2d 560, 570 [59 Cal.Rptr. 569]; *Berry* v. *Chrome Crankshaft*

*Co.,* 159 Cal.App.2d 549, 552 [324 P.2d 70].) Third, we are persuaded from the record before us that the juvenile court judge distinguished the factual matters in the report from the probation officer's conclusions and opinion.

 We turn to appellants' contention that Penal Code section 647, subdivision (f), is unconstitutionally vague and uncertain in that it provides no ascertainable standard of guilt and thus denies due process of law. Section 647 provides that: "Every person who commits any of the following acts shall be guilty of disorderly conduct, a misdemeanor:

"· · · · · · · · · · · ·

"(f) Who is found in any public place under the influence of intoxicating liquor, . . . in such a condition that he is unable to exercise care for his own safety or the safety of others, . . ."

We are confronted at the outset with the fact that in *In re Newbern,* 53 Cal.2d 786 [3 Cal.Rptr. 364, 350 P.2d 116], the Supreme Court declared unconstitutional former subdivision (11) of Penal Code section 647, which categorized as a vagrant anyone who was "a common drunk." The court concluded that the term has neither technical, common law nor usage meaning. Appellants would draw an analogy between "common drunk" and the word "safety," arguing that it has no meaning derived from common usage and hence is unconstitutionally vague. As we read *Newbern,* the thrust of the criticism, insofar as pertinent to our case, is that the term "common drunk" connotes something other than the physical and mental condition of an accused *at a particular time;* a past course of conduct as well as the degree of intoxication at the time of arrest were involved in an interpretation of former subdivision (11). Had intoxication alone been the criterion there would not have been the same problem, and it is somewhat paradoxical that the word "common" lent vagueness to the statute for it lacked a commonly understood meaning when conjoined with the word "drunk" to form the term "common drunk." Each jury necessarily was required to determine according to its own standards how many times a person had to become intoxicated and how frequently, or perhaps both, to be classified a common drunk.

In response to *Newbern,* the Legislature amended section 647, deleting subdivision (11) and adding subdivision (f), quoted above. It delineates a standard that is applicable to a particular condition at a particular time, to wit: a person in a public place under the influence of alcohol, in such condition that he is unable to exercise care for his own safety or the safety of others.

Appellants argue that the amendment to section 647 did little to remedy

the defect as the word "safety," is likewise unconstitutionally vague and uncertain.

We find no parallel between the word "safety" in subdivision (f) and the term "common drunk." The safety of an intoxicated person or his disregard for the safety of others is a present condition that can be determined from facts existing at the time of arrest. No prior act or conduct is involved; the person need not have been inebriated before. Appellants seem to argue that a catalogue of factual situations must be defined in the statute for the guidance of the trier of fact, but the test is whether people of ordinary intelligence understand the meaning of the word "safety" in applying it as the standard of conduct of a person charged with violation of subdivision (f). ▪ We learn from California Jurisprudence (14 Cal.Jur.2d, Criminal Law, § 110, pp. 318-319) that: "As part of substantive due process of law, a criminal statute must be so definite and certain that it gives a fair warning, not necessarily with mathematical exactitude, but sufficient to inform a person of ordinary or average intelligence, of what acts or omissions it declares to be prohibited and punishable."

No case has been cited, and we find none through independent research, discussing the commonly accepted meaning of "safety" or "safety of others" in a constitutional frame of reference. There are a number of interesting cases wherein a similar attack was made upon the constitutionality of a statute; in *People* v. *McCaughan,* 49 Cal.2d 409 [317 P.2d 974], the Supreme Court considered the validity of Penal Code section 361, providing that "Every person guilty of any harsh, cruel, or unkind treatment of, or any neglect of duty towards, any idiot, lunatic, or insane person is guilty of a misdemeanor," and made the following observations: "The phrase 'neglect of duty' has an accepted legal meaning. It means an intentional or grossly negligent failure to exercise due diligence in the performance of a known official duty. [Citation.] The word 'cruel' has a commonly accepted meaning. It means '(d)isposed to give pain to others; willing or pleased to hurt or afflict. . . .'" (Pp. 414-415.)

Thus "neglect of duty" and "cruel treatment" were found to have commonly understood meanings, but as to the words "harsh" and "unkind" the court said: "It is apparent from the mere recitation of the meanings ascribed to 'harsh' and 'unkind,' most of them indefinite themselves, that men of common intelligence must necessarily guess at the meaning of these words as used in the statute and that they will differ as to their application in a specific situation. The words in question have no established common law meaning." (P. 415.)

Perhaps even more analogous is the reasoning of the Supreme Court in *People* v. *Nunn,* 46 Cal.2d 460, 468-469 [296 P.2d 813]: "The phrase

'good faith' in common usage has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation. [Citations.] "We therefore hold that the words 'good faith' as used in Health and Safety Code, section 11330, have a definite and well-understood meaning, are free from ambiguity, and their use in the statutes does not violate the due process clause of the federal Constitution." (See also *In re Bushman,* 1 Cal.3d 767, 772 [83 Cal.Rptr. 375, 463 P.2d 727].)

The word "safety," as used in Penal Code section 647, subdivision (f), whether related to a defendant himself or to others, like the words "good faith" as used in Health and Safety Code section 11330, has a commonly understood meaning which gives adequate notice of the conduct proscribed. To begin with, there is a clear and understandable dictionary definition of "safety": "1. Condition of being safe; freedom from danger or hazard. 2. Quality of being devoid of whatever exposes one to danger or harm; safeness." (Webster's New Collegiate Dict., 1960 ed.)

We find also that the word is used in article I, sections 1 and 4, and article XX, section 21, of the California Constitution. It is used in the Code of Civil Procedure, Labor Code, Public Utilities Code, Harbor and Navigations Code, Business and Professions Code, Public Resources Code, Government Code, Vehicle Code, Elections Code, Education Code, and others.

The point is, the word "safety" is widely and commonly used, as evidenced by the foregoing catalogue of code and Constitution uses, and it cannot be said that by reason of its use in subdivision (f) of Penal Code section 647 the statute is unconstitutionally vague and uncertain. Appellants beg the question, really, as the thrust of their argument is directed at the difficulty in establishing a degree of intoxication, not at the vagueness of the word "safety." But it is not uncommon for the issue of guilt to turn upon a question of degree even though the result may hinge upon a jury's interpretation of subjective evidence. For example, a charge of driving while under the influence of intoxicating liquor, a violation of Vehicle Code section 23101, presents much the same problem of proof as appellants raise here, in that the evidence often centers upon opinions formed by arresting officers. Opinion evidence of this character is admissible under both decisional law (see Witkin, Cal. Evidence (2d ed. 1966) § 398, p. 358) and the Evidence Code (§ 800), provided the opinion is based upon the perception of the witness.

In short, we find no constitutional vagueness emanating from use of the word "safety" in subdivision (f) of section 647 of the Penal Code, nor in

the fact application of the term may rest in large part upon opinion evidence, a subjective test. In the case before us, the officers, in addition to expressing their respective opinions that the three appellants were intoxicated, testified in detail as to what they perceived, including the belligerent, obnoxious and abrasive verbal statements and physical actions of appellants.

This brings us to appellants' contention that their guilt was not proved beyond a reasonable doubt. At the time the case was argued the United States Supreme Court had not decided *In re Winship,* 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], and appellants relied largely upon Penal Code section 1096. Their contention was that regardless of *In re Dennis M.,* 70 Cal.2d 444 [75 Cal.Rptr. 1, 450 P.2d 296], a minor is entitled under the United States Constitution to have his guilt determined according to the same standard of proof as an adult. The United States has now so held in *Winship,* concluding: "In sum, the constitutional safeguard of proof beyond a reasonable doubt is as much required during the adjudicatory stage of a delinquency proceeding as are those constitutional safeguards applied in *Gault* [387 U.S. 1 (18 L.Ed.2d 527, 87 S.Ct. 1428)]— notice of charges, right to counsel, the rights of confrontation and examination, and the privilege against self-incrimination." (P. 1075 [397 U.S. at p. 368, 25 L.Ed.2d at pp. 377-378].)

We point out that, unlike *In re Gladys R., supra; In re Corey, supra;* and *In re Steven F., supra,* which reconstrued a state statute, in *Winship* the United States Supreme Court formulated a new constitutional rule that overturned prior decisions of the California Supreme Court delineating the burden of proof in juvenile cases. (*In re Dennis M., supra.*)

The trial judge did not state for the record what standard of proof he applied in finding the allegations that appellants violated Penal Code section 647, subdivision (f), to be true. It is not within our province to determine the unenunciated standard of proof in the mind of the juvenile court judge which governed his decision, since this is a purely subjective matter, and any attempt to do so necessarily would be to speculate. We must assume that the judge followed the law of the State of California at the time, which required proof by a preponderance of the evidence.

Nor can we, as an appellate court, determine whether the evidence meets the *Winship* standard. There is a conflict in the evidence: the two appellants who testified said none of the three was intoxicated; the matron at juvenile hall stated that she could not tell whether appellants were resisting the officers because the boys were intoxicated or were angry at being arrested. We, of course, did not see the witnesses; we cannot judge

the case from the printed page. We are not triers of fact; it is axiomatic that appellate courts do not weigh the evidence.

The vexing question is not whether appellants were denied a constitutional right; they were. The question is whether *Winship* is to be applied retroactively and, if so, to what extent. Both the United States Supreme Court and the California Supreme Court have discussed prospective and retroactive application of cases enunciating new rules of constitutional law. (*Desist* v. *United States,* 394 U.S. 244 [22 L.Ed.2d 248, 89 S.Ct. 1030]; *People* v. *Edwards,* 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713].) Prospective application has been confined largely to constitutional imperatives aimed at preventing impermissible procedures in obtaining evidence. Where a new standard affects the fairness of the trial, that is, a constitutional error presents a serious risk that the issue of guilt or innocence may not have been reliably determined, the courts have leaned toward retroactive application.

Because the case at bench was not final on the date the United States Supreme Court filed its opinion in *Winship,* we are not concerned with total retroactivity, that is, whether it applies to a final judgment. ■ We conclude that a minor's constitutional right to a determination of guilt according to the standard established in *Winship* is applicable to cases pending on appeal. (*People* v. *Rollins,* 65 Cal.2d 681, 686 [56 Cal.Rptr. 293, 423 P.2d 221]; *People* v. *Charles,* 66 Cal.2d 330, 334 [57 Cal.Rptr. 745, 425 P.2d 545].)

The judgment is reversed.

Gargano, J., concurred.

**COAKLEY, J.**—I dissent. I do so primarily with respect to the holding in the majority opinion that *In re Winship,* 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], applies retroactively to cases such as this, i.e., cases pending on appeal on the date the *Winship* opinion was filed, March 31, 1970. There has as yet been no such determination by either the United States Supreme Court or by our California Supreme Court. I do not read either *Desist* v. *United States,* 394 U.S. 244 [22 L.Ed.2d 248, 89 S.Ct. 1030], or *People* v. *Edwards,* 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713], as requiring retroactive application of *Winship* in this case.

The issue in both of the cited cases was whether a prior decision of the United States Supreme Court involving, as here, alleged rights under the

Constitution should be given retroactive application. In *Desist,* the court held that *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], which proscribed electronic eavesdropping on private conversations, "should be given wholly prospective application." In *People* v. *Edwards,* 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713], where the issue was the prospective or retroactive application of the decision in *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], a case involving the validity of a search and seizure, the court held: "that there should be no distinction between final judgments and those not yet final and that *Chimel* is to apply only to cases in which the search was conducted after the date of that decision."

In rejecting the appellant's contention that because it had recently given retroactive application to other decisions of the United States Supreme Court in newly declaring certain constitutional rights[1] it should do so in *Edwards,* the court said, at page 1110: " 'Each . . . rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved.' " (Citing *Johnson* v. *New Jersey,* 384 U.S. 719, 728 [16 L.Ed.2d 882, 86 S.Ct. 1772].)

The minors in this case received a fair hearing under the then existing and long-established rules governing hearings in juvenile courts, and though the record is silent as to whether the court believed that violation of Penal Code section 647, subdivision (f), was established beyond a reasonable doubt or by a preponderance of the evidence only,[2] my review of the record satisfies me that the proof amply met the newly declared standard of proof beyond a reasonable doubt, called for by *In re Winship, supra.*

It should be noted that unlike our case where the court made no statement as to the quantum of proof, the court in *Winship* noted that the judge of the New York Family Court, who made the adjudication of delinquency, expressly "acknowledged that the proof might not have established guilt beyond a reasonable doubt."

Finally, I point out that *Winship* holds only that proof that a minor

---

[1] (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221]; *People* v. *Charles,* 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d 545].)

[2] This undoubtedly is because such a finding is not required by the Juvenile Court Law (Welf. & Inst. Code, div. 2, pt. 1, ch. 2, art. 9), and it is not the practice of juvenile court judges to make such a finding. (See Welf. & Inst. Code § 702 for the required finding, and for the suggested form of finding see Cal. Juvenile Court Practices (Cont.Ed.Bar.) §§ 150-151, pp. 135-136.)

committed the offense charged must be established beyond a reasonable doubt. It does not hold that the failure of the judge to declare that such quantum of proof is present requires a reversal if, in fact, the higher standard of proof is met.

I would affirm the judgment.

Respondent's petition for a hearing by the Supreme Court was denied July 16, 1970.