[Crim. No. 19949. Second Dist., Div. Five. Sept. 6, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCARIO GARCIA, Defendant and Appellant.

**COUNSEL**

Barry Tawlow for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Robert F. Katz and William K. McCallister, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—Charged with the murder of John Paul Gonzales defendant was, after a court trial, found guilty of second degree murder. After a referral under section 1203.03 of the Penal Code he was sentenced to state prison.

FACTS

The charge arose out of a post-midnight confrontation in the parking lot of the Coral Room on Beverly Boulevard in East Los Angeles. There is no question that Gonzales met his death as a result of a shot from a gun in defendant's hand. The record contains the usual contradictions on the questions of provocation, aggression, self-defense, accidental firing, and so forth. One chief defense effort was to create a reasonable doubt whether defendant had the capacity to harbor malice, such capacity having been allegedly diminished by intoxication. (*People* v. *Conley,* 64 Cal.2d 310, 323-326 [49 Cal.Rptr. 815, 411 P.2d 911].) The trial court explicitly found that the defendant's level of intoxication was not sufficient to negative malice.[1] It did not help the defense that after the shooting defendant had sufficient presence of mind to run to his car, drive away, park the car, attempt to dispose of the gun and call his wife to ask her to come and pick him up.[2]

---

[1]The court: "It is apparent to the Court that there was drinking by the defendant and his companion. I'll admit that the drinking of the defendant and his companion, the Court believes was probably less than asserted and the Court did listen with some attentiveness to the recipe which the bartender gave, that is, of an ounce and a half of Scotch, and has done the mathematical computations involved.

"It would seem, as in other considerations, that probably the level of intoxication of the defendant may have affected his judgment but was not really to the point of diminishing it to nonrecognition of the acts which he participated in."

[2]The court: "The ability of the defendant to discern what he is doing and his rational processes and so forth are certainly demonstrated by his ability to run to

## DISCUSSION

On appeal, the chief defense contentions relate to the finding that defendant harbored malice and was, therefore, guilty of second degree murder rather than voluntary manslaughter. It is contended: first, that in performing its delicate task of determining the frame of mind with which defendant shot the victim the court used erroneous legal criteria; second, that the application of correct rules would have compelled an acquittal of murder.

We agree with the first argument; the second will become immaterial. In view of the disposition which we think proper, we shall first discuss other claims of error. They relate to alleged: 1. improper refusal to permit an expert to testify on behalf of the defense; 2. improper refusal to hear lay opinion evidence from defendant's wife; 3. "character assassination" by the prosecutor; and 4. erroneous consideration of certain matters at the time of sentencing.

### 1. *The Expert Testimony*.

At one point during the defense presentation of the case counsel announced that he intended to call two psychiatrists. It then appeared that one of the two doctors had been sitting in the courtroom. This was a violation of a previous order excluding witnesses. The court announced its "impression" that this made the witness incompetent to testify. Court then adjourned until the next day, when defense counsel announced: "My doctor is sitting back there again. Doctor, I am afraid you will have to stay out, now that I know you are here." The doctor apparently left the courtroom and that is the last anyone heard about medical or psychiatric testimony.

Unquestionably, had the trial court acted on its initial "impression" that the violation of the exclusion order made Doctor Fernandez incompetent to testify, it would have committed error. (*People* v. *Duane,* 21 Cal.2d 71, 80 [130 P.2d 123].) It is, however, perfectly obvious that the court kept an open mind on the subject and was never, in effect, called upon to make a ruling. It is also clear that defense counsel never felt that the court had actually determined that the doctor could not testify: had he thought so, what would have been the point in having the doctor come back the next day?

We thus do not even reach the point whether, had the court ruled that Doctor Fernandez was incompetent, defendant had made an adequate record with respect to the "substance, purpose, and relevance of the ex-

the car and drive it away, call on the telephone, and apparently subsequently deposit the gun at some other location than to having it on his person at the time that he was subsequently apprehended and taken into custody."

cluded evidence." (Evid. Code, § 354; cf. *Lawless* v. *Calaway*, 24 Cal.2d 81, 91 [147 P.2d 604].)

## 2. *The Lay Opinion.*

■ The lay opinion which was rejected was that of defendant's wife whose testimony that defendant was drunk shortly after the homicide was stricken on motion. She was, however, permitted to testify that defendant's breath smelled of liquor, that he walked "like wabbly," spoke slurringly and thought incoherently.

Frankly we do not care whether, technically, the court's ruling was right or wrong.[3] It is a sad reflection on our continuing belief in the sporting theory of justice that no less than eight[4] grown men have now spent time on the question whether, in a court trial, a wife who is subject to cross-examination, may testify from personal observation that her husband was drunk or whether it is the judge's function to so conclude from testimony that he smelled of liquor, walked "like wabbly," spoke slurringly and thought incoherently.

## 3. *The "Character Assassination."*

The defense complains of certain instances of misconduct perpetrated by the People during the cross-examination of defendant and his wife.

No particular point would be served by burdening this opinion with a detailed recital of the portions of the record which lead to the defense charge. One incident or series of incidents consists of a prosecution attempt to prove that under otherwise undisclosed circumstances defendant had been in possession of a gun in 1967. At that time he was an ex-felon, having been convicted of possession of marijuana in 1964.[5] This prosecution attempt was made both during the cross-examination of defendant's wife and of defendant himself. No evidence of the 1967 gun possession came from the wife, so the point is irrelevant as to her testimony, nor was any real evidence concerning the 1967 incident produced from de-

---

[3]It was wrong. (*In re Joseph G.*, 7 Cal.App.3d 695, 703 [87 Cal.Rptr. 25]; *People* v. *Ravey*, 122 Cal.App.2d 699, 702-703 [265 P.2d 154]; *Stuart* v. *Dotts*, 89 Cal. App.2d 683, 686-687 [201 P.2d 820]; 7 Wigmore, Evidence (3d ed. 1940) § 1974; Witkin, Cal. Evidence (2d ed. 1966) § 398.) The ruling may have been provoked by a ground rule defense counsel insisted on during the presentation of the People's case in chief, when he had successfully secured equally erroneous rulings that the People's witnesses could not testify whether or not defendant was intoxicated.

[4]Both the People and defendant have new counsel on appeal.

[5]There is a subsidiary question whether a 1966 federal conviction of 18 United States Code, section 1407(a) was also a felony conviction.

fendant. The trial court sensibly decided that the subject should be dropped, which is what happened.

The whole matter is a storm in a teapot. If anything was solidly established, it was that on the day of the homicide in question defendant was very much in possession of a gun and that he was still an ex-felon, whatever bearing that may have had on his credibility.

### 4. *The Sentence.*

■ It is argued that the sentence must be vacated because the trial court relied on "the unsubstantiated opinion of an employee of the corrections department in determining whether appellant should be released." We assume that by "released" counsel means "admitted to probation."

In view of our disposition of the case, this point becomes immaterial. Suffice it to say that no error appears. The "employee" referred to is the Deputy Superintendent of the Southern Reception Guidance Center, who signed the recommendation which followed the diagnostic study under section 1203.03 of the Penal Code. His opinion was not unsubstantiated, in that it was based on then current social and psychological evaluations. What the defense is really quarrelling with is the fact that the recommendation was, in part, based on records of arrests which did not result in convictions. We know of no rule which would prevent the court from relying on the recommendation for that reason alone. (Cf. *People* v. *Smith,* 259 Cal.App.2d 814, 824-825 [66 Cal.Rptr. 551].)

### 5. *The Finding of Malice.*

■ Even the objective events of the hours preceding the homicide lie under a fog cover composed of bias, interest, prevarication, alcohol, simple inability to perceive and failure to recall. Unaided by any rules concerning burden of proof, no one could say with any certainty what really happened. Yet the problem of finding the objective facts appears simple compared with the task of determining defendant's frame of mind at the time of the shooting. It was therefore vital that the trier of fact have a clear concept of the applicable burdens of producing evidence and of proof. (Evid. Code, §§ 110, 115.) The record in this case demonstrates such error with respect to the former that, were this a jury case, a reversal would be compelled.

The case having been tried to the court, we are perhaps freer to look into the problem of actual prejudice. On that point, as a trial court problem, the case is obviously a very close one on the question of second degree murder versus voluntary manslaughter. Indeed, the totality of facts is such that—fine points of law aside—most experienced trial lawyers and judges

would undoubtedly feel that a manslaughter verdict or finding was the most probable outcome. This makes it impossible to overlook erroneous legal concepts which may have colored the fact-finding process.

Defendant makes much of the fact that during the argument on his motion for a new trial and for a reduction to manslaughter, the court, in its discussion of defendant's capacity to harbor malice, talked exclusively of the cognitive attributes of that frame of mind, while apparently ignoring the qualitative deterioration of the volitional aspects brought about by the consumption of alcohol. (*People* v. *Conley,* 64 Cal.2d 310, 322-323 [49 Cal.Rptr. 815, 411 P.2d 911]; cf. *People* v. *Wolff,* 61 Cal.2d 795, 822 [40 Cal.Rptr. 271, 394 P.2d 959].) This possible overemphasis is, however, too frail to support a reversal. (*People* v. *Gorshen,* 51 Cal.2d 716, 734-735 [336 P.2d 492].)[6]

Far more serious is the fact that in the tug of war between the prosecution and the defense, with the one pulling for a finding of first degree murder, the other claiming manslaughter, the court erroneously gave the People a head start of precisely one degree of felonious homicide.

This is what happened: When the prosecution's case was virtually complete, with just a few loose ends remaining to be tied up, the court remarked:

"I wonder if perhaps the Court can make some observations with reference to this case of People versus Marcario Garcia, before we take it up again.

"It is the Court's belief, under the evidence that has been thus far adduced, *that the People have made out a prima facie case of 187 in the first degree.*

"It is my judgment that with this course, we have reached the stage of the case which is mentioned in People vs. Soules, 41 Cal.App.2d 298, in which it was observed by the Court the homicide having been conclusively

---

[6]Defendant has perhaps a stronger argument to the effect that the trial court failed to appreciate that the voluntary consumption of alcohol may affect the capacity to harbor malice, even if it does not produce unconsciousness. (See the court's remarks quoted in fn. 1, *supra,* that defendant's intoxication "was not really to the point of diminishing [his judgment] to non-recognition of the acts which he participated in.") If "non-recognition of acts" means the same as unconsciousness, the court effectively read voluntary manslaughter due to diminished capacity to harbor malice out of the law. (See *People* v. *Conley,* 64 Cal.2d 310, 324-326 [49 Cal.Rptr. 815, 411 P.2d 911].) It is, however, hard to believe that the court meant what it seemed to mean. There was no claim that defendant was unconscious. If the court really felt that the law therefore permitted only a finding of murder, it would have spent considerably less time than it did justifying its finding.

established, the burden of showing that it was justifiable rested on the defendant.

"In other words, at the present time, if I understand the facts of the case, the homicide is conceded. The identity of the defendant is conceded, *and we are at the stage simply where we are to determine whether there is any reason it shouldn't be in the first degree, and this comes by way of defense* and possible rebuttal, I agree with that. And I think that the People ought to be able to put on whatever evidence they feel is relevant in that particular area and the Court ought to have liberality in permitting the widest possible presentation of evidence.

"But is there any reason we should proceed with the People's case if the Court states this, that beyond reasonable doubt, this is the view of the Court?" (Italics added.)

The only conceivable relevance of *People* v. *Soules,* 41 Cal.App.2d 298 [106 P.2d 639], is that at page 314 of the opinion the court refers—in quite another context—to section 1105 of the Penal Code.

At no time during the trial did the court indicate that it had changed its mind with respect to the application and effect of section 1105 as announced in its remarks quoted above.

That these remarks demonstrate one clearly erroneous concept and strongly hint at another, cannot be doubted.

Whatever "burden" of mitigation, justification or excuse devolves on defendant when the People's proof brings section 1105 into play, it is only to mitigate, justify or excuse murder in the second degree. (*Jackson* v. *Superior Court,* 62 Cal.2d 521, 525-526 [42 Cal.Rptr. 838, 399 P.2d 374].) The court, however, spoke as if section 1105 were the equivalent to an order directing defendant to show cause why he should not be found guilty of first degree murder—". . . we are to determine whether there is any reason it shouldn't be in the first degree and this comes by way of defense . . . ."

To be sure defendant then succeeded in doing something to persuade the court that the killing was not first degree murder after all. The trouble, however, is that the court made the defense start behind the line which section 1105 and the decisions interpreting it designate as the correct one.

When a defendant, charged with murder, claims diminished capacity due to voluntary ingestion of alcohol, factually the range of the evidence on the amount and effect of his drinking often permits findings all the way from first degree murder down to involuntary manslaughter. (*People* v. *Conley, supra,* 64 Cal.2d at pp. 324-326, fn. 4.) Even legally the court is

faced with a continuum, rather than a series of clearly defined alternatives: except in extreme situations no law tells us just how much effect on premeditation negates first degree murder, or to what extent the capacity to harbor malice must be lessened before the crime is not even murder of the second degree. In this case, how can we have any real confidence that the trial court correctly assessed the effect of defendant's consumption of alcohol when we know that it first required him to overcome an erroneously imposed presumption of premeditation and deliberation?[7]

However certain—after it had heard the defense case—the court may have felt in its own mind that the People had proved malice beyond a reasonable doubt, it is inescapable that it arrived at that certitude by way of a shortcut to which the People were not entitled.

There is one other matter which would require extended consideration if we could not dispose of the case on the problem just discussed. It is this: The law is perfectly clear to the effect that section 1105 places no burden of persuasion on the defendant, but merely declares a rule of procedure imposing on him the duty of going forward with evidence sufficient to raise a reasonable doubt of his guilt of murder. (*Jackson* v. *Superior Court, supra,* 62 Cal.2d 521, 526; *People* v. *Deloney,* 41 Cal.2d 832, 841 [264 P.2d 532]; *People* v. *Lewis,* 1 Cal.App.3d 698, 701 [81 Cal.Rptr. 900].) Reading the trial court's quoted remark, it is difficult to escape the conclusion that it had no such restricted view of defendant's burden to escape a conviction for murder. We can, however, pass the point.

### DISPOSITION

Had the trial resulted in a conviction of voluntary manslaughter, this court could not touch it. Defendant has, at most, shown that he is entitled to a reduction to that crime. The People, however, are privileged to try

---

[7]We note for the record that a few minutes after the court's remarks quoted above, it said: "Well, all that I am stating is that if the People rested now, I would be convinced that they made out a prima facie case . . . . And I am not stating that it is first degree murder. I just state that if we stopped right here, I would feel that the People have proved, beyond a reasonable doubt, their case. So that the Soules case, I don't cite anything other than the fact that at this point, it seems to me the defendant should come forward with whatever the explanation is that you decide. And this, of course, will have material effect on the character of the offense. In other words, if there is some diminished capacity or some kind of provocation or self-defense, all these features are important." In context, the most that can be read into this remark is a statement that while the People had proved first degree murder by proof beyond a reasonable doubt, the court recognized that the defense had not yet had its inning. There is no question that when the court referred to the People's contentions as "their case," it meant a case of first degree murder. Previously, the People had resisted bail pending trial on the ground that they would ask for the death penalty.

to obtain another conviction of murder. The record clearly contains sufficient evidence to justify the attempt. On the other hand, the prosecution may decide that it is satisfied with voluntary manslaughter—a decision which we neither suggest nor discourage. Our disposition should, therefore, preserve these options. (Cf. Pen. Code, §§ 1260, 1262; *People* v. *Aikin,* 19 Cal.App.3d 685, 706 [97 Cal.Rptr. 251]; *People* v. *Shavers,* 269 Cal. App.2d 886, 889-890 [75 Cal.Rptr. 334].)

The judgment is reversed with directions as follows: If the People, within 30 days from the issue of the remittitur, file a written demand for a new trial, such a trial shall take place; if no such demand is filed, the trial court shall proceed as if the remittitur constituted a finding of guilty of voluntary manslaughter (Pen. Code, § 192, subd. 1) on such thirtieth day and proceed to resentence defendant after appropriate proceedings with respect to a possible grant of probation. (See *People* v. *Causey,* 230 Cal.App.2d 576, 579 [41 Cal.Rptr. 116].)

Stephens, J., and Aiso, J., concurred.