[Civ. No. 763. Fifth Dist. June 2, 1967.]

SHIRLEY RUSSELL, Plaintiff and Respondent, v. JOHN GEIS, Defendant and Appellant.

EVELYN GARRISON, Plaintiff and Respondent, v. JOHN GEIS, Defendant and Appellant.

(Consolidated Cases)

Fitzwilliam, Memering, Stumbos & DeMers and Louis A. DeMers for Defendant and Appellant.

·Rust & Hoffman, Hughes, Maul, Fogerty & Dezzani, David C. Rust, Charles F. Fogerty, Ellis J. Horvitz and B. V. Yturbide for Plaintiffs and Respondents.

STONE, J.—On April 1, 1963, defendant, a physician, severed his association with another doctor to engage in the sole practice of medicine in Placerville. Defendant offered plaintiff Russell, who had been receptionist for the two doctors, a position as his bookkeeper. She declined because of lack of experience, but accepted a position as receptionist. Plaintiff Garrison was then engaged as bookkeeper.

Approximately two and a half months later defendant, being dissatisfied with the book work of Mrs. Garrison, made Mrs. Russell the bookkeeper and Mrs. Garrison the receptionist. Both women made appointments, accepted payments from patients, issued receipts, and made entries on the books. They also assisted the doctor by cleaning his equipment and keeping the treatment rooms in order. Defendant had a firm of accountants establish a bookkeeping system for him, which neither plaintiff understood, nor, apparently, did defendant. Many items which should have been entered in an "adjustment column" were entered as credits; in fact, the adjustment column was seldom used unless the doctor specifically directed an entry.

From time to time defendant accepted payments directly from patients and pocketed the money without notifying plaintiffs or making any bookkeeping entry. When a patient who had paid the doctor asked for a receipt at the outer office, one of the plaintiffs would check with him to verify payment. In such an instance the books reflected an irregularity as the money receipted for appeared as a debit entry but there was no bank deposit entry to offset it. However, the doctor estimated that he pocketed no more than $200 from fees for the entire year. Defendant also bartered medical services for the goods or services of patients, rather than money payments, transactions which were not properly reflected by book entries.

In December 1963 plaintiff Russell prepared a summary of accounts receivable for the year. Defendant believed the summary was inaccurate, and had his wife, who was not a bookkeeper, go over the accounts with him. As a result of this

informal audit, defendant concluded that in excess of $5,000 was unaccounted for. He told two friends, Dr. Bliss and Dr. Bonser, that there were discrepancies in his books, and asked their advice. His personal attorney advised him to see the district attorney. He talked to a representative of the sheriff's office, Lieutenant Barton, who met with defendant and Deputy District Attorney DuFort.

Defendant told DuFort there were discrepancies in his books, that money was missing, and that plaintiffs were the persons responsible for the books. According to DuFort, defendant told him he believed plaintiffs had taken the money, although defendant denied making the accusation. DuFort advised him to have an audit, which defendant was reluctant to do. DuFort told him, "No audit, no prosecution." DuFort testified that he formed an opinion that plaintiffs were guilty of theft primarily on the statements made by defendant.

On January 24, 1964, defendant called plaintiffs into his office and, in the presence of one of his patients who was a deputy sheriff, and one of his accountants, Mr. Duce, questioned them about two accounts and asked them to explain some discrepancies in the books. Plaintiffs replied that they could not understand the bookkeeping system. After Duce and Herman left, defendant told plaintiffs he was going to have an audit made. Plaintiff Russell testified that the following then occurred: "Q. Now, will you tell the ladies and gentlemen what the doctor said to you and that lady then in the room?

"A. Well, at this time he said that he had told Mr. Duce to go ahead with an audit. It was prearranged at this time. To us he said that he was too small of a business to absorb the cost of an audit. It would cost a lot of money. He said now, girls, this is not blackmail, but if you will pay me $5,000 cash, no promissory notes, because it is too easy for you to go through bankruptcy, he wanted to get the whole thing. He said that it was a small community, we all had children in school and that it would be hard on the children and—excuse me. That our husbands may never work, and that as embezzlers, we would never be able to work again.

"Q. Was there anything said at that time about criminal proceedings?

"A. He said that if it came to that, he is a professional man and his word would carry more weight than ours."

Plaintiff Garrison's testimony corroborated that of plaintiff Russell as to this episode.

Defendant denied that he accused plaintiffs of stealing, but admitted he told them that if either could recall what had happened to the money they could approach him and the matter would go no further because he was not interested in retribution; that if the audit showed no discrepancies they could return to work, but if it showed discrepancies their employment would be terminated; that he did not want to prosecute them; that they all had families and none of them wanted to undergo adverse publicity, but if the audit bore out the discrepancies he and his wife found, he would pursue the matter through criminal action rather than by a civil suit, because of bankruptcy laws. He suspended plaintiffs without pay, requested the keys to the office, and withheld their paychecks for earnings during the pay period.

Plaintiffs went to the labor commission in order to get their pay. Mrs. Russell testified that she received hers in May 1964.

On February 21, 1964, defendant's attorney, who was neither trial nor appeal counsel, wrote to the State of California, Department of Industrial Relations, Division of Labor Law Enforcement, 600 Forum Building, 1107 9th Street, Sacramento, California, as follows: "The above two persons, Evelyn Garrison and Shirley Russell, were responsible for the handling of Dr. Geis' books, collection of all accounts receivable, deposit of all monies in the doctor's bank account and other related matters. A preliminary check of the books in the early part of January 1964 resulted in their suspension, as there appeared to be a shortage of money which had been paid by patients but not deposited in the bank, or used in the business by the doctor."

A copy of the letter was sent to defendant, who admitted receiving it and doing nothing. He testified, "When I got the letter, the harm was done."

A notice was forwarded to defendant by the Department of Employment, advising him that plaintiffs were seeking unemployment benefits. He went to the department, saw Mr. Hegwer, and told him that an audit was being conducted, that there were discrepancies in the books, and that plaintiffs were responsible for the books. He denied telling Hegwer that plaintiffs took the missing money. He said he went to the department to prevent payment of unemployment benefits to

plaintiffs because he did not want his account as an employer charged.

Defendant testified that the completed audit did not show that money was missing, but did show discrepancies in the books. However, subsequent to completion of the audit, defendant testified at a grand jury hearing at which plaintiffs were indicted. A trial followed, defendant testified for the prosecution, and plaintiffs were unanimously acquitted.

Thereafter, in 1965, plaintiff Russell, after holding a job for a short time, again applied for unemployment benefits. Despite the fact that Mrs. Russell had been acquitted of the criminal charge defendant opposed her right to unemployment benefits by advising the department that he was currently engaged in litigation with her. He testified that he did this because the instant lawsuit was pending and he wanted to protect himself from liability.

Mrs. Garrison testified that while she was in the Department of Employment office filling out an application for a position with Safeway Stores, defendant entered the room, spoke to a girl at the counter who directed him to a man seated at a desk next to the one at which she was seated. She testified that she heard the following conversation between defendant and the department employee:

''He said, 'I've come to discuss the claims and eligibility of two of my former employees, Evelyn Garrison and Shirley Russell who are under suspicion—' excuse me, '—under investigation at this time,' and the gentleman said, 'I can't help you on that one. You'll have to see Mr. Haigwar.' ''

Each plaintiff filed a complaint for defamation. Defendant answered, denying the material allegations of the complaints, and affirmatively alleged the defenses of truth, that any statement made was without malicious intent, and of conditional privilege pursuant to section 47, subdivision 3, of the Civil Code.

The two cases, consolidated for trial, are also consolidated on this appeal.

A novel question is presented as to the propriety of the trial court in striking the defense of conditional privilege at the conclusion of defendant's case.

Civil Code section 47 provides: ''A privileged publication or broadcast is one made—

'' . . . . . . . . . .

''3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one

who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information.''

The persons to whom defendant allegedly made the accusations against plaintiffs were unquestionably ''interested persons'' within the rationale of section 47. The court took the issue from the jury, which at first blush would appear to be error, but a review of the record reflects that the trial judge had no choice but to rule out the defense of conditional privilege. Defendant had flatly denied ever making defamatory or accusatory statements about either plaintiff at any time. Additionally, at least twice when asked whether he believed the girls had taken any money from him, defendant unequivocally answered ''No, sir.''

Every authority we find discussing the subject of conditional privilege, whether a judicial opinion, Restatement of the Law, textbook or treatise, is in accord that for one to assert the defense of conditional privilege he must believe the defamatory matters to be true. (*Snively* v. *Record Publishing Co.*, 185 Cal. 565, 578 [198 P. 1]; *Emde* v. *San Joaquin County etc. Council*, 23 Cal.2d 146, 154 [143 P.2d 20, 150 A.L.R. 916]; *Brewer* v. *Second Baptist Church*, 32 Cal.2d 791, 796 [197 P.2d 713]; *Di Giorgio Fruit Corp.* v. *AFL-CIO*, 215 Cal.App.2d 560, 568 [30 Cal.Rptr. 350]; 3 Rest., Torts, § 600; 1 Harper & James, Law of Torts, p. 452.) We learn from Prosser, Law of Torts (3d ed.) page 822, the reason for the rule is that ''there is no social advantage in the publication of a deliberate lie, the privilege is lost if the defendant does not believe what he says.''

Even were we to interpret defendant's answers to questions concerning his belief that plaintiffs took his money to mean merely that he *did not know* whether they had, still he could not avail himself of conditional privilege which requires belief in the truth of the defamatory matters. If there was uncertainty in his mind, it was his duty to have the books audited to ascertain the facts. Particularly is this so where the condition of the books was partly due to defendant's lack of an understanding of his own bookkeeping system and his failure to have proper entries made when he accepted fees from patients.

In view of defendant's uncontradicted testimony that he never believed plaintiffs took his money, we find no error in

taking the defense of conditional privilege from the jury and determining that issue as a matter of law.

 Defendant contends the court erroneously admitted damaging hearsay evidence over his objection. Defense counsel cross-examined plaintiff Garrison about the circumstances of an alleged publication of a defamatory statement during the time defendant was discussing the missing money with the two plaintiffs as follows: "Q. All right. Now, at the time Dr. Geis talked to you and Mrs. Russell, this was after Mr. Herman and Mr. Duce left that day, of January 24, is that correct? A. That is correct.

"Q. Did he mention either you or Mrs. Russell by name during this conversation. A. He pointed his finger in both our faces and said, 'you.'

"Q. Did he mention your name, Evelyn Garrison? A. It was very obvious when he was pointing his finger in my face and saying, 'You bring me $5,000,' that he didn't mean someone down the street.

"Q. Did he mention you by name—Evelyn Garrison? A. He never called me Evelyn Garrison the—the complete name, no. He never called me the complete name at anytime while I worked with him.

"Q. Did he mention Shirley Russell's name? A. He pointed his finger in her face also and acted in a very irrational manner.

"Q. Did he mention her by name? A. He pointed at her, and he did not say—"

In an effort to impeach Mrs. Garrison, defense counsel then referred to her answer to interrogatories, and the following occurred: "Q. And in this interrogatories, it is asked that you please state the name and address of all persons present and the name and place, which you contend the defendant made the statement. 'Evelyn Garrsion is being investigated by me and my accountants for theft. There are thousands of dollars missing and I believe Evelyn Garrison is involved.' In answer to that statement, these were submitted to you in November of 1964, was that right? A. Yes.

"Q. And you answered them, and you stated that it was made at the time to Shirley Russell. And at the time, you did mean at that time? A. Yes.

"Q. That the time—that you had this meeting with Dr. Geis? A. Yes, I did."

The import of this cross-examination was to bring out that whereas Mrs. Garrison testified that defendant did not men-

.tion her or Mrs. Russell by name at the time he talked to the two of them, in answer to interrogatories she said he mentioned them by name.

Counsel for Mrs. Russell, the coplaintiff, took the witness when defendant finished his cross-examination, and, referring to the foregoing cross-examination, asked Mrs. Garrison:

"Q. But that was only part of the answer, wasn't it? A. Yes, it was.

"Q. And the rest of the answer states the rest of the people, doesn't it? A. Yes.

"MR. RUST: I would like to read the complete answer, if the Court please.

"MR. DEMERS: Objection. Hearsay as to my client."

The court overruled the objection, and Mrs. Garrison was asked: "All right. And in answer to the interrogatories, you put, in answer to these questions, 'Mr. George DuFort, Placerville,' correct? A. Right.

"Q. And Mr. Louis Hegwer, correct? A. Right.

"Q. Of the Department of Employment. A. Right."

The answer in the interrogatory, naming Louis Hegwer as one to whom a defamatory statement was made, was undeniably hearsay. Mr. Hegwer was not called as a witness, and the doctor testified that he did not accuse plaintiffs of taking his money during the conversation with Hegwer. Thus the hearsay answer to the interrogatory stands uncorroborated. Plaintiffs justify the hearsay statement under former Code of Civil Procedure section 1854, which provides: "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, *which is necessary to make it understood,* may also be given in evidence." (Italics added.)

The critical language of section 1854, however, is the limitative phrase "which is necessary to make it understood." Defense counsel cross-examined plaintiff Garrison about her testimony concerning a specific event; the other persons were not present on that occasion. The cross-examination made no reference to an alleged defamation at another time and in another place to Mr. DuFort, or at another time and place to Mr. Hegwer. Thus the portion of the answer concerning DuFort and Hegwer was not necessary to make the questions asked plaintiff Garrison understood. To the contrary, adding

the names of Hegwer and DuFort tended to obscure the previous answers that pertained to only the two plaintiffs.

The question is whether the error requires a reversal. Defendant argues there was no proof adduced that he made defamatory statements to Hegwer, other than the hearsay statement introduced in the manner discussed above. After reviewing some 1,250 pages of transcript we are convinced that the jury's verdict was neither based upon nor materially affected by this isolated hearsay statement. (Cal. Const., art. VI, § 13; *Knowles* v. *Robinson,* 60 Cal.2d 620, 630 [36 Cal. Rptr. 33, 387 P.2d 833]; *Weber* v. *Leuschner,* 240 Cal.App.2d 829, 840 [50 Cal.Rptr. 86].)

During *voir dire* examination of a juror, counsel for one of the plaintiffs asked whether the juror had heard about the criminal trial. Defense counsel objected to the question, and assigned it as misconduct. Argument as to the admissibility of evidence concerning the criminal trial was then heard, out of the presence of the jury. The trial court ruled that it was proper to ask a juror on *voir dire* whether he had heard of the criminal case and, if so, the juror's state of mind as to the present case. But the court reserved a ruling on the admissibility of evidence concerning the prior criminal action until the question should arise during the course of the trial. The ruling was: "The court will reserve any comment on the latter basis [sensitivity, humiliation and fear resulting from the criminal action] for the opposing objection; . . ."

Although the trial judge commented, in passing, that he believed the evidence was admissible, he did not rule other than as to the propriety of the question put to the juror on *voir dire.*

As to the *voir dire* examination of jurors, we think the court was on firm ground. It would be unrealistic to ignore the fact that in El Dorado County, with fewer than 40,000 people, there could be a grand jury indictment charging two women employees of a doctor in the county seat with embezzlement, followed by a trial and their acquittal, without those facts becoming known to just about every prospective juror in the county. In the circumstances, it seems to us that it would have been exceedingly unfair to the defendant not to ask prospective jurors whether they had heard of the criminal trial and, if so, whether anything they learned would prevent them from commencing the trial of the defamation action with an open mind.

The question whether the court was right or wrong as

to the admissibility of other evidence concerning the criminal trial is academic, since defendant raised no objection at the time of its introduction. We learn from Witkin, California Evidence (2d ed. 1966) section 1285, page 1188, that "Where inadmissible evidence is offered, the party who desires to raise the point of erroneous admission on appeal must *object* at the trial, *specifically* stating the grounds of his objection, and directing the objection to the *particular evidence* which he seeks to exclude. Obviously, failure to object at all waives the defect. [Citations.]"

■ Defendant next assigns as error permission granted plaintiffs to amend their prayer for relief from $50,000 to $100,000 after the trial commenced. The circumstances were these: Approximately a week before trial, counsel for one plaintiff advised defense counsel that he intended to amend the prayer of his complaint by increasing the claim for general damages from $50,000 to $100,000. The morning of the trial, and before trial commenced, counsel for the other plaintiff advised defense counsel that he intended to move to increase the prayer of his complaint from $50,000 to $100,000. From the record, we gather that defense counsel said nothing one way or the other. No formal motion to amend was made, however, and the trial commenced. During questioning of the second juror, defense counsel asked:

"Now, have you ever been sued for $50,000 general damages and $50,000 punitive damages, Mr. McLaskey?

"MR. McLASKEY: No.

"MR. DeMERS: That is the prayer in this case. You wouldn't take that lightly either, would you?"

Questioning was interrupted and during a conference that followed between court and counsel, plaintiffs' attorneys advised the court they wished to move to increase the prayers of the complaints. Defense counsel objected, citing *Sanguinetti* v. *Moore Dry Dock Co.*, 36 Cal.2d 812 [228 P.2d 557], which holds that after the evidence in a case is submitted it is error for a trial judge to hear a motion to increase the amount of the prayer in the presence of the jury and to order it so increased. The obvious impact of a proceeding such as occurred in *Sanguinetti* is to give rise to an inference that the court, having heard the same evidence that was presented to the jury, concluded that the plaintiff was entitled to a judgment at least greater than that asked for originally.

The case before us differs materially. In the first place, the motion to increase the prayer of the complaint was not made

in the presence of the jury. In the second place, at the outset of the trial, with full knowledge of plaintiffs' intention to ask permission to amend the prayers of the complaints, defendant mentioned the amount asked in the original complaints, before any evidence had been adduced. His admitted intention was to preclude any amendment, under the doctrine of *Sanguinetti*.

The case of plaintiff Garrison, who sought $50,000 in the original complaint and was awarded a verdict of $45,000, comes within the purview of cases cited in *Sanguinetti* holding that in these circumstances the amendment of the prayer of a complaint could not reasonably be said to have influenced the jury's verdict, which was for an amount less than that asked for in the original prayer. On the other hand, plaintiff Russell's original complaint asked for $50,000 general damages, while the jury awarded her $55,000. Even so, a review of the entire record convinces us that the amendment of the complaint increasing the prayer for relief had no bearing on the jury's verdict. The manner in which the amendment occurred differs so materially from the facts of *Sanguinetti* that we hold the error, if any, was harmless.

■ Defendant asserts that, over objection, plaintiffs were erroneously permitted to testify to hearsay statements concerning the effect of defendant's defamatory statements. For example, Mrs. Garrison was permitted to testify that her daughter came home from school and said she was no longer permitted to play with children she had formerly played with, and that children told her her mother was a thief. While it is true these and similar statements were hearsay, they were admitted not for the purpose of determining the truth of the statements, but to prove that the statements were, in fact, made. The distinction is set forth in Witkin, California Evidence (2d ed. 1966) section 463, page 425, as follows: " 'There is a well-established exception or departure from the hearsay rule applying to cases in which the very fact in controversy is *whether certain things were said or done* and not as to whether these things were true or false, and in these cases the words or acts are admissible not as hearsay but as original evidence.' (*People* v. *Henry* (1948) 86 Cal.App.2d 785, 789 [195 P.2d 478], *infra*, § 465; see also *People* v. *Rosson* (1962) 202 Cal.App.2d 480, 486, 487 [20 Cal.Rptr. 833], *infra*, § 471.)

"In these situations the words themselves, written or oral, are 'operative facts,' and an issue in the case is whether they

were uttered or written. (See McCormick [McCormick on Evidence], p. 463; 6 Wigmore [Wigmore on Evidence], § 1770; Selected Writings [Selected Writings on the Law of Evidence and Trial (Assn. of American Law Schools)], p. 761; 2 U.C.L.A. L.Rev. 48; 19 Cal.L.Rev. 246; 1955 A.S. [Annual Survey of American Law] 622; *infra,* §§ 464, 465.)'' (See *Weber* v. *Leuschner, supra,* 240 Cal.App.2d at p. 840.)

There was no error in permitting plaintiff Garrison to relate the hearsay statements in her testimony concerning her humiliation and mental suffering.

■ Defendant argues that, conversely, the court erred in not permitting him to testify as to conversations that were clearly hearsay, designed to show his ''state of mind'' at the time he talked to plaintiffs and allegedly made the accusatory statements. He specifies a conversation had with a sheriff's officer before holding his conversation with the girls; he wished to show his state of mind resulting from the conversation with the officer. Objection was properly sustained since defendant's state of mind was not in issue. He denied that he made the statements attributed to him by the two girls, and it would be incongruous, to say the least, to permit him to explain his state of mind in making a statement which he denied making.

■ There remains defendant's contention that damages awarded to plaintiff Garrison of $45,000, and to plaintiff Russell in the sum of $55,000, are excessive. ■ The basic rule guiding an appellate court reviewing a record where excessive damages are assigned as reversible error is found in *Seffert* v. *Los Angeles Transit Lines,* 56 Cal.2d 498, at page 507 [15 Cal.Rptr. 161, 364 P.2d 337]. It is, in substance, that the amount of damages is a fact question committed, first, to the discretion of the jury, and then to the trial judge on motion for a new trial; an appellate court can interfere ''only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.'' (See *Daggett* v. *Atchison, T. & S.F. Ry. Co.,* 48 Cal.2d 655, 666 [313 P.2d 557]; *Torres* v. *City of Los Angeles,* 58 Cal.2d 35, 53 [22 Cal.Rptr. 866, 372 P.2d 906]; *Weber* v. *Leuschner, supra,* 240 Cal.App. 2d at p. 842.)

■ Here, each plaintiff introduced substantial evidence of damage to her reputation, of humiliation, and of mental suffering, as well as the inability to obtain employment.

Under the principles enunciated in the numerous cases discussing the subject of damages, we cannot say that either judgment is so excessive that it must be set aside.

The judgments are affirmed.

Conley, P. J., and Gargano, J., concurred.