Filed 12/19/13  Pelz v. Villeda-Weaver CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CARLOS PELZ, | B245043 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC456491) |
| v. | |
| FRANKO VILLEDA-WEAVER, as Personal Representative, etc., et al., | |
| Defendants and Respondents. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Richard E. Rico, Judge.  Affirmed.

John Elson for Plaintiff and Appellant.

Kinsella Weitzman Iser Kump & Aldisert, Dale Kinsella and Jeremiah Reynolds for Defendants and Respondents Franko Villeda-Weaver and Bell-Phillip Television Productions, Inc.

Kelley Drye & Warren, Keri E. Campbell and Damaris M. Diaz for Defendants and Respondents CBS Broadcasting Inc. and Jody Lawrence-Miller.

Defendant Ron Weaver was a senior producer for the television show the Bold and the Beautiful, and he published and distributed a memorandum critical of plaintiff Carlos Pelz's job performance as a "key" hair stylist for the television show.[1] The memorandum contains statements such as Pelz "has a negative attitude, is perceived as a slacker, and is not carrying an adequate work load," and his "hair styling does not match the emotional and contextual requirements of the script." Pelz filed a defamation action against Weaver, and the production company that Weaver works for, Bell-Phillip Television Productions, Inc. (BPP). Based upon information obtained during discovery, Pelz amended his complaint to name his employer CBS Broadcasting, Inc. (CBS) and Jody Lawrence-Miller, his supervisor at CBS, alleging slander arising from Lawrence-Miller's statements to Weaver regarding Pelz's job performance.

The BPP defendants (Weaver and BPP) and the CBS defendants (Lawrence-Miller and CBS) filed separate summary judgment motions, asserting the common-interest privilege of Civil Code section 47, subdivision (c), applicable to defamatory statements made without malice to one who is interested, barred this action as a matter of law. We conclude the BPP defendants and the CBS defendants met their burden to show the allegedly defamatory statements were made on a privileged occasion, and Pelz has not raised a triable issue of fact to show malice to overcome the privilege. Thus, the trial court correctly granted the summary judgment motions on this ground. Accordingly, we affirm the judgments.

UNDISPUTED MATERIAL FACTS

1. *The Parties*

Pelz was a key hair stylist for the Bold and the Beautiful (the Show), a television show BPP produced. Weaver was a senior producer at BPP. Rhonda Friedman was a supervising producer, and she supervised Pelz's work on the Show. The Show is filmed on a CBS sound stage.

---

[1] Ron Weaver is deceased, and Franko Villeda-Weaver, the personal representative of the estate of Ron Weaver, has been substituted in as a party to this action.

Pelz was a CBS employee. CBS provides staff to the Show and bills BPP for the labor costs. In 1989, CBS assigned Pelz to the Show. Pelz's immediate supervisor at CBS was Lawrence-Miller. Lawrence-Miller reported to Harvey Holt, the vice president of stage operations.

2. *Pelz's Salary and the Show's Production Schedule*

In 2008, BPP changed its production schedule to four days per week for approximately 32 weeks per year. Because Pelz was a CBS employee, BPP was being billed for his annual salary, amounting to approximately four or five months when Pelz was not working.

Weaver tried to reduce the labor costs incurred in paying CBS employee's salaries while the Show was on hiatus. A series of e-mails beginning in January 2008 through June 2009 memorializes his efforts. Weaver's initial e-mail is an inquiry into the cost of "putting the CBS staff employees we now cover on a freelance basis . . . ." Weaver questioned whether Pelz and others "[c]ould . . . be laid off and re-hired as freelance." In a subsequent e-mail to Holt, Weaver explained that BPP had "no budget" to pay Pelz and another hair stylist when the Show was not in production and would no longer pay their salary. Weaver, however, suggested Holt come up with a proposal in which BPP might contribute to Pelz's salary. Weaver then sent an e-mail to BPP's co-owners in which he proposed that the production company temporarily cover Pelz's salary to ensure that he remained a CBS employee to keep his health benefits. Weaver informed Holt that BPP had agreed to pay Pelz's salary, at a reduced rate, provided CBS assign Pelz to other shows while on hiatus to defer the salary costs. Because Pelz was not assigned to other shows, Weaver's e-mails state that BPP and CBS agreed to split the cost of Pelz's salary during the Show's hiatus until Pelz became eligible for Medicare benefits.

3. *Pelz's Performance Issues Addressed in Weaver's Memorandum*

In March 2010, Weaver sent a memorandum to Holt in which he raised several issues related to Pelz's poor job performance. Weaver drafted the memorandum after consulting with Friedman and Lawrence-Miller.

3

a. *March 18, 2010 Memorandum (Allegedly Published March 22)*

In a memorandum addressed to Holt and dated March 18, 2010 (March 18 memorandum), Weaver described seven issues related to Pelz's job performance: (1) "[Pelz] is coasting toward retirement," and he "has a negative attitude, is perceived as a slacker, and is not carrying an adequate work load"; (2) "he often signs out well before the wrap"; (3) "[w]hen he does cover the stage he is often not <u>on</u> stage," requiring stage managers to track him down; (4) "[h]e has been told that reading scripts is part of his job," but "[o]n many occasions, the hair styling does not match the emotional and contextual requirements of the script"; (5) "[m]ost of the women on the show prefer to have their hair done by others on the staff"; (6) "[a]s key, an essential part of the job is continuity," and "[w]e've been advised that actresses have been taking their own pictures in order to remember how they're supposed to appear when scenes are taped on different days"; and (7) his "work has a 'dated' look." The March 18 memorandum asked Holt to replace Pelz as the key hair stylist.[2]

Weaver sent copies of the March 18 memorandum to Brad Bell, one of BPP's owners, Friedman, and Lawrence-Miller.

b. *Draft of Weaver's March 18 Memorandum*

In an e-mail to Bell, Weaver attached a draft of the March 18 memorandum (hereafter Draft). The e-mail states that Weaver and Friedman met with Lawrence-Miller to discuss Pelz's performance. Weaver further states in the e-mail that both Lawrence-Miller and Holt "concur" that Pelz "needs to go." Weaver wrote: "We and CBS have tried to protect him by agreeing to split with CBS his salary during dark weeks. No good deed goes unpunished, as they say. He's become bitter, is bad for morale, and his work is inadequate."

---

[2]    The March 18 memorandum further states: "If we do not see a complete turnaround in attitude, work habits, and the quality of his work sufficient to ensure that he is carrying a reasonable share of the workload of the department, we request that he be removed from the show."

c. *Republication of the March 18 Memorandum*

In October 2010, Weaver sent the March 18 memorandum to Ed Scott, a newly hired booth producer.

4. *Pelz Receives the March 18 Memorandum*

Pelz was given a copy of the March 18 memorandum and was counseled to improve his work performance. Upon return from hiatus, Pelz was injured when he tripped and fell at work. While he attempted to return after his injury, he has not been able to return to work and is collecting long-term disability benefits.

PROCEDURAL BACKGROUND

1. *The Third Amended Complaint*

Pelz's third amended complaint (complaint) for libel and slander is based on Weaver's March 18th memorandum, Weaver's e-mail and the attached Draft, and Lawrence-Miller's statements to Weaver concerning Pelz's job performance.

a. *Libel Claims against Weaver and BPP (First, Second, Third Causes of Action)*

Pelz alleges three separate libel claims arising from (1) the March 18 memorandum, (2) the Draft and e-mail attaching the Draft, and (3) the republication of the March 18 memorandum. Pelz alleges that the statements in the March 18 memorandum were false "and were made with malice, and were understood by all to whom the memo was shown as claims that plaintiff (a) was lazy, (b) did not care about his work, (c) produced poor quality work, (d) was incompetent, (e) was unfit to continue to function as the 'key' hairstylist [*sic*] for *The Bold and The Beautiful*, and (f) should be removed as a hair stylist . . . ." Pelz alleged Weaver and BPP published the March 18 memorandum because they wanted to get rid of him, despite the quality of his work.

In his e-mail attaching the Draft, Weaver allegedly made false statements that CBS management agreed that Pelz should be removed from the Show, and falsely claimed that Pelz "had 'become bitter, is bad for morale, and his work is inadequate.' "

The BPP defendants raised as an affirmative defense that the challenged communications were protected by the common-interest privilege.

5

b. *Slander Claim against Lawrence-Miller and CBS (Fourth Cause of Action)*

Pelz repeats the allegations in the complaint regarding the statements in the March 18 memorandum in his slander cause of action against Lawrence-Miller and CBS. Pelz further alleged Lawrence-Miller falsely stated that her statements regarding Pelz's job performance were reported to her by other employees.

The CBS defendants raised the affirmative defense that the challenged communications were protected by the common-interest privilege, and also asserted that any alleged statement, if made, was an expression of opinion.

2. *Motions for Summary Judgment*

a. *BPP Defendants' Motion Based on the Common-Interest Privilege*

The BPP defendants moved for summary judgment on their defense that Weaver's communications were privileged under the common-interest privilege of Civil Code section 47, subdivision (c). The BPP defendants argued that Weaver was responding to Holt's request regarding Pelz's poor job performance, and the March 18 memorandum and e-mail with the attached Draft were sent to people who had a common interest in evaluating Pelz's performance. In support of the motion, the BPP defendants presented evidence that Weaver had reasonable grounds for his belief in the truth of his statements in the March 18 memorandum.

b. *CBS Defendants' Motion*

The CBS defendants moved for summary judgment by raising defenses to the slander cause of action, arguing Lawrence-Miller did not make the comments as alleged in the complaint, and any criticism she may have communicated to Weaver regarding Pelz's job performance was privileged. The CBS defendants also argued that based upon *Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, an employer's performance evaluation of an employee cannot support a cause of action for libel. In support of the motion, the CBS defendants presented evidence that Lawrence-Miller had reasonable grounds for her belief in the truth of her statements to Weaver.

3. *Summary Judgment Motions Granted, Appeal*

The trial court granted the BPP defendants' and the CBS defendants' motions for summary judgment on the ground that the common-interest privilege was a complete defense to the complaint. Judgments were entered. Pelz's motion for new trial was denied, and he timely filed this appeal.

DISCUSSION

1. *Standard of Review*

A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850; Code Civ. Proc., § 437c, subd. (c).) A defendant satisfies this burden by showing that there is a complete defense to the complaint. (Code Civ. Proc., § 437c, subd. (p)(2).)

We independently determine whether, as a matter of law, summary judgment was properly granted. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

2. *Conditional Common-Interest Privilege*

"Defamation is effected either by libel or slander." (*Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1368.) Libel is a "false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) Slander is a "false and unprivileged" oral communication that "[t]ends directly to injure [a person] in respect to his office, profession, trade or business . . . ." (Civ. Code, § 46, subd. (3).)

Civil Code section 47, subdivision (c) is a conditional privilege against defamatory statements made without malice between persons on a matter of common interest.[3]

---

[3] Civil Code section 47 provides in part: "A privileged publication or broadcast is one made: [¶] . . . [¶] (c) [i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."

Communications by employers about employee conduct, made without malice to persons who have a common interest or a need to know as a matter of business necessity are presumptively privileged. (*Manguso v. Oceanside Unified School Dist.* (1984) 153 Cal.App.3d 574, 580-581; see also *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 440-441 [privilege applies to an employer's statements to employees regarding the reasons for terminating another employee]; *Deaile v. General Telephone Co. of California* (1974) 40 Cal.App.3d 841, 845-846, 847 [privilege applies to statements by management to supervisors who repeated statements to employee explaining why an employer disciplined an employee].)

Malice is not inferred from the communication in statements falling within the conditional common-interest privilege. (Civ. Code, § 48.) "For purposes of this statutory privilege, malice has been defined as ' "a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person." ' [Citations.]" (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1204; *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 723; *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538-1539 & fn. 18.)

A shifting burden generally applies to establish the common-interest privilege defense. The defendant bears the initial burden of demonstrating that the allegedly defamatory communication was made upon a privileged occasion, and the plaintiff then bears the burden of proving the defendant made the statement with malice. (*Lundquist v. Reusser*, *supra*, 7 Cal.4th at pp. 1210-1214.) As shall be shown, Pelz has not established that a triable issue of fact exists to show malice to defeat the common-interest privilege.

3. *The Trial Court Did Not Err in Granting the BPP Defendants' Motion*

a. *The Common-Interest Privilege Applies*

Pelz contends summary judgment was improperly granted because the BPP defendants did not establish that the common-interest privilege applied to all three libel causes of action alleged in the complaint. As to the first two causes of action, Pelz does not dispute that the allegedly defamatory statements in the March 18 memorandum and Draft, made by Weaver in a memorandum to Pelz's employers concerning his

8

performance, were made upon a "privileged occasion" for purposes of the common-interest privilege. With respect to the third cause of action, alleging republication of the March 18 memorandum to Scott, Pelz contends it was not made upon a "privileged occasion," because Scott was not employed when Weaver circulated the memorandum.

The circulation of the March 18 memorandum to Scott is a "privileged occasion" for purposes of the common-interest privilege. (See *Cuenca v. Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 995-996 ["[c]ommunications made in a commercial setting relating to the conduct of an employee have been held to fall squarely within the qualified privilege for communications to interested persons"].) Scott, as a new booth producer, supervised Pelz. Scott had an interest in Pelz's past performance issues, and he was in the best position to observe whether Pelz's performance improved. The BPP defendants met their burden.

b. *Pelz Did Not Meet His Burden to Raise a Triable Issue of Fact*

Pelz raises several arguments to contend he has presented sufficient evidence to raise a triable issue of fact that Weaver acted with malice in publishing the March 18 memorandum, publishing the e-mail with the attached Draft, and republishing the March 18 memorandum to Scott. None of Pelz's arguments has merit.

(1). *The Primary Motivation for the March 18 Memorandum*

Pelz contends he "alleged in some detail malice sufficient to prevent the common interest privilege from even arising," that is, "Weaver wanted to get rid of Pelz to avoid paying his salary expense during hiatuses which CBS would charge back to Bell-Phillip." Stated another way, Pelz argues Weaver was motivated not for purposes of chronicling Pelz's poor performance, but for an economic purpose, which to be actionable would have to fall into the category of hatred or ill will for the purpose of injuring Pelz. (See *Lundquist v. Reusser*, *supra*, 7 Cal.4th at p. 1206, fn. 12 [" 'Conditionally privileged occasions are created in order to permit the publisher of the defamation to protect the interest which is entitled to protection. . . . [W]here the primary purpose is another

9

purpose, e.g., a desire to injure the defamed person, this is an abuse of the occasion and no privilege comes into being.' "].)[4]

The state-of-mind Pelz attributes to Weaver is not supported by the undisputed facts and the reasonable inferences drawn from these undisputed facts. Pelz was not a BPP employee, so BPP did not need a pretext to remove him from the Show. It is undisputed that by the terms of the agreement with CBS, BPP did not have to use Pelz's services. Pelz would receive his salary even if he did not work on the Show. Thus, Pelz's belief that Weaver had an improper motive for writing the March 18 memorandum is mere speculation and conjecture, which is legally insufficient to defeat a summary judgment motion. (See *Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1404.)

Because Pelz has no evidence of an improper motive, this case is distinguishable from *Cloud v. Casey* (1999) 76 Cal.App.4th 895, a case Pelz relies on to show Weaver's March 18 memorandum identifying performance issues was a pretext to remove him from the Show. In *Cloud v. Casey*, the plaintiff was denied a promotion because she purportedly lacked operational experience, but the jury also heard evidence that the operational criterion was developed after the successful candidate obtained the position. (*Id*. at pp. 900, 912.) "From this [evidence] the jury could conclude that operational experience was not a real requirement for the position, but a pretext utilized by the corporations to explain away its gender-based decision." (*Id*. at p. 912.) Here, unlike *Cloud v. Casey*, where the decisionmaker attempted to hide the unlawful basis with a false explanation, no unlawful or unprivileged motive can be inferred from the March 18

---

[4] The parties dispute whether malice also may be shown by establishing that the allegedly defamatory statement was made for a reason other than to protect the interest that is entitled to protection. (See *Manguso v. Oceanside Unified School Dist.*, *supra*, 153 Cal.App.3d at pp. 580-581.) As the California Supreme Court stated in *Lundquist v. Reusser*, *supra*, 7 Cal.4th 1193, the "good faith" requirement of the common-interest privilege distinguishes a conditional or qualified privilege from an absolute one. (*Id*. at p. 1206, fn. 12.) " 'The difference between absolute and qualified privilege lies in the effect of the motive and purpose of the defamer.' " (*Ibid*.)

10

memorandum. Moreover, unlike Cloud, Pelz suffered no adverse employment action – he was not replaced on the Show, and he remained a CBS employee.

(2). *Reasonable Grounds for Belief*

Pelz next contends that Weaver had no reasonable grounds to believe the statements in the March 18 memorandum, citing to contradictory evidence. This misses the point. The BPP defendants presented evidence that Weaver had a reasonable belief the statements in the March 18 memorandum were true following his meeting and discussions with Pelz's supervisors. While Pelz may disagree with the issues raised in the March 18 memorandum, or present evidence to suggest that the criticism was not justified, this is not the relevant question in the context of libel. "For purposes of establishing a triable issue of malice, 'the issue is not the truth or falsity of the statements but whether they were made recklessly without reasonable belief in their truth.' " (*McGrory v. Applied Signal Technology, Inc.*, *supra*, 212 Cal.App.4th at p. 1540.)

Pelz counters that there was no reasonable basis for Weaver's belief that Pelz's performance was lacking because during this time period, he won back-to-back Emmy awards for hair styling. This evidence is undisputed, but it does not raise a triable issue of fact that Weaver lacked a reasonable belief in the statements made in the March 18 memorandum. Many of the points raised in the March 18 memorandum addressed performance issues unrelated to hair styling. Pelz has presented no evidence giving rise to a reasonable inference that Weaver wrote the March 18 memorandum without a reasonable belief in the content.

(3). *Weaver's Alleged Falsehoods*

Pelz also contends there is a triable issue of fact that Weaver acted with malice in drafting the March 18 memorandum because Weaver (1) falsely claimed in verified interrogatory responses that he had spoken to Laura Yale, a stage manager, and Christine Lai-Johnson, a CBS employee and make-up artist on the Show, regarding Pelz's job performance, and (2) falsely stated in his e-mail attaching the Draft that both Lawrence-Miller and Holt agreed that Pelz "needs to go."

11

Weaver's discovery response regarding Yale and Lai-Johnson was amended to correct the mistake. Weaver amended his response to state that "[s]ome of the assertions in the memorandum may have been communicated to Jody Lawrence or Rhonda Friedman by Laura Yale, Stage Manager, employed by CBS, and Christine Lai-Johnson, employed by CBS and other employees of CBS and Bell-Phillip." At most, Weaver's earlier and mistaken response was mere negligence. As noted, the malice standard, not negligence, governs whether the common-interest privilege applies. (See *Noel v. River Hills Wilsons, Inc., supra,* 113 Cal.App.4th at pp. 1370-1372.)

To further support the point that Weaver's discovery response shows he lacks credibility, Pelz relies on *Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832, a dog-attack case, arguing evidence of a witness's "falsehood creates a triable issue as to any fact to be proved by the testimony of that witness." (Capitalization omitted.) *Donchin* held that a false exculpatory statement of the landlord's lack of knowledge of the dogs' existence at the premises is evidence of a guilty conscience. (*Id.* at p. 1841.)

In *Donchin*, the landlord initially denied, but later admitted that he knew the dogs lived on the rental property. (*Donchin v. Guerrero*, *supra*, 34 Cal.App.4th at p. 1835.) The initial denial, which the court termed a "false exculpatory statement," was evidence attempting to show he had no liability. A false exculpatory statement is "evidence of a declarant's state of mind and demonstrates his knowledge he has committed a wrong." (*Id.* at p. 1841.). The court held that when combined with the other evidence concerning the dogs' behavior, a trier of fact could infer that when the landlord lied about knowing that the dogs were living at the property, his denial may be used to infer that the landlord had a guilty conscience about the dogs' dangerous propensities. (*Id.* at pp. 1842-1845.)

*Donchin* does not apply here because Weaver's initial interrogatory response is not a false exculpatory statement, tending to show a guilty conscience. Whether Weaver did or did not talk to Yale or Lai-Johnson has no bearing on proving or disproving malice. Weaver's initial interrogatory response, followed by his amended response does not lead to an inference that the statements in the March 18 memorandum were recklessly made without reasonable belief in their truth.

As for Weaver's statement about Pelz, Weaver testified that he could not recall whether either Lawrence-Miller or Holt told him that Pelz "needs to go," but Weaver formed that opinion. Weaver testified: "Jody Lawrence had . . . told us, Rhonda and me, in the meeting, that she had spoken with Carlos [Pelz] about many of these issues many times . . . and that was my speculation, that, you know . . . there had been no change . . . in many of these issues, and . . . it was my speculation that it was time for him to – to be done." This testimony (and the other testimony cited on this point) does not raise a triable issue of fact as to whether Weaver acted with malice. Weaver's speculation and opinion was reasonably based upon his conversations with Pelz's supervisors. (See *Noel v. Rivers Hills Wilsons, Inc*., *supra*, 113 Cal.App.4th at p. 1371.)

(4).     *Exaggerated Tone of the March 18 Memorandum*

Finally, Pelz contends Weaver's exaggerations and tone in the March 18 memorandum raise a triable issue of fact as to the existence of malice. In support of this contention, Pelz principally relies on *Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, in which the Supreme Court noted that although malice may not be inferred from communicating a defamatory statement, the tenor of the defamatory statement may be evidence of malice. (*Id*. at p. 799.) In *Brewer*, the church's charges to expel the plaintiffs after they had joined a lawsuit against the church were designed to injure their reputation in the church and to cause them to be shunned and avoided. (*Id*. at p. 796.) The plaintiffs were charged with "having 'revealed themselves as totally unworthy of the continued confidence, respect, and fellowship of a great church,' " and "willing to lie in order to injure their church." (*Id*. at p. 796.) One of the plaintiffs was charged with a "vile spirit," and both were associated with one who " 'under the role of a minister of Jesus, is one of Satan's choicest tools.' " (*Ibid*.)

The tenor of the March 18 memorandum addressing Pelz's poor job performance is quite different from the church's charges in the *Brewer* case. Pelz quotes the following statements that undercut his reliance on *Brewer*: (1) "When he does cover the stage he is often not <u>on</u> stage"; (2) "[m]ost of the women on the show prefer to have their hair done by others on the staff"; and (3) "[a]s key, an essential part of the job is continuity." Pelz

13

claims these statements are untrue and contradicted, but unlike charges of a "vile spirit,"

and a "liar," no inference can be drawn from the tenor of the March 18 memorandum to

create a triable issue of fact as to malice.[5]

Because Pelz did not raise a triable issue of fact to show the existence of malice,

the BPP defendants established the common-interest privilege was a complete defense to

the complaint.  Accordingly, summary judgment was properly granted.

4.  *The Trial Court Did Not Err in Granting the CBS Defendants' Motion*

The slander action against the CBS defendants is based upon Weaver's and

Friedman's testimony that Lawrence-Miller made comments regarding Pelz's job

performance.  There is no dispute that Lawrence-Miller's communications fall within the

common-interest privilege.[6]  (*King v. United Parcel Service, Inc.*, *supra*, 152 Cal.App.4th

at p. 440.)

a.  Russell v. Geis *Does Not Defeat the Common-Interest Privilege*

Citing *Russell v. Geis* (1967) 251 Cal.App.2d 560, Pelz contends that the CBS

defendants are precluded as a matter of law from raising the common-interest privilege

defense because Lawrence-Miller did not believe the statements attributed to her were

actually true.  In *Russell v. Geis*, the court held that when a defendant testified that he did

not believe the allegedly defamatory statement to be true, he may not assert the privilege.

(*Id*. at pp. 566-567.)  "[T]he reason for the rule is that 'there is no social advantage in the

---

[5]     We have considered and rejected the remaining arguments Pelz raises in his briefs
to attempt to establish a triable issue of fact to show the existence of malice.

[6]     The CBS defendants also moved for summary judgment based on *Jensen v.
Hewlett-Packard Co., supra,* 14 Cal.App.4th 958, which held that unless an "employer's
performance evaluation falsely accuses an employee of criminal conduct, lack of
integrity, dishonesty, incompetence or reprehensible personal characteristics or
behavior . . . , it cannot support a cause of action for libel." (*Id*. at p. 965.)  The trial court
did not grant the motion on this ground.  (Code Civ. Proc., § 437c, subd. (m)(2).)  We
need not reach this issue, having concluded the motion was properly granted on the
common-interest privilege defense.

14

publication of a deliberate lie, the privilege is lost if the defendant does not believe what he says.' " (*Id.* at p. 566.)

While Pelz argues that Lawrence-Miller denied making the statements in the March 18 memorandum or believing the statements to be true, his focus is on Lawrence-Miller's responses to deposition questions in which she was asked whether she used the specific phrases in the March 18 memorandum. Lawrence-Miller did not draft the March 18 memorandum, nor does the memorandum specifically attribute verbatim any of these statements to Lawrence-Miller. It is undisputed that Lawrence-Miller had criticisms concerning Pelz's performance and discussed some of her concerns about Pelz with Weaver.[7] Lawrence-Miller also testified that to her knowledge, there was nothing false or incorrect in the March 18 memorandum. For these reasons, *Russell v. Geis*, *supra*, 251 Cal.App.2d 560, is inapposite.

b. *Pelz Did Not Meet His Burden to Establish a Triable Issue of Fact*

Pelz raises several arguments to contend he has presented sufficient evidence to raise a triable issue of fact that Lawrence-Miller acted with malice when she discussed Pelz's performance issues with Weaver. None has merit.

(1). *The Primary Motivation for Lawrence-Miller's Comments*

Pelz contends that like Weaver, Lawrence-Miller's comments were not motivated for the purpose of discussing Pelz's job performance but to punish him because he declined her request to answer her phone during the Show's hiatus. The cited evidence does not support this contention. Pelz testified that Lawrence-Miller was upset with him, but he did not know why, stating "that's the only thing I can think of." Pelz's suspicions of improper motives primarily based upon conjecture and speculation are not sufficient to raise a triable issue of fact.

---

[7] Lawrence-Miller recalls a telephone conversation with Weaver, but Weaver and Friedman recall a person-to-person meeting. This testimony only establishes that Lawrence-Miller cannot recall where she talked to Weaver or if she also talked to Friedman, which is not a material fact.

15

(2).    *Reasonable Grounds for Belief*

Pelz next contends Lawrence-Miller had no reasonable grounds for her criticism of his performance because during this period he won back-to-back Emmy awards. Lawrence-Miller testified that (1) Pelz was not handling his responsibilities as key hair stylist; (2) he left early, which was inconsistent with his role as a key hair stylist; (3) she received complaints that he could not be located, which caused problems on the set; (4) other hair stylists told her that Pelz was not carrying his fair share of the work load; and (5) the Show's actresses preferred to have their hair done by other stylists. Lawrence-Miller's concerns about Pelz's job performance were either based on her own personal observations or were reported to her by other CBS employees working on the Show. Pelz has presented contradictory evidence, including his Emmy awards, to show these criticisms were unfounded or false, but for purposes of establishing malice, the issue is whether the statements were made recklessly without reasonable belief in their truth. (*McGrory v. Applied Signal Technology, Inc.*, *supra*, 212 Cal.App.4th at p. 1540.) Pelz has not met his burden to raise a triable issue of fact.

(3).    *Lawrence-Miller's Falsehoods*

Pelz also contends he has established a triable issue of fact as to the existence of malice because Lawrence-Miller made false statements (1) denying the comments attributed to her by Friedman and Weaver, and (2) denying meeting with Weaver to discuss Pelz's performance issues.

First, Pelz's numerous citations to the record do not support his contention that Lawrence-Miller categorically denied she had discussed Pelz's performance issues with Weaver, or she did not believe the content of the March 18 memorandum. Lawrence-Miller denied making or believing Weaver's statement in his e-mail to Bell that Pelz had "become bitter, is bad for morale, and his work is inadequate." This statement was Weaver's opinion and was not attributed to Lawrence-Miller. As to the contents of the March 18 memorandum, Lawrence-Miller denied making certain statements as phrased and denied using certain phrases to describe her concerns regarding Pelz's performance, but she did not deny the truth of statements made in Weaver's March 18 memorandum.

16

As previously noted, many of Lawrence-Miller's concerns regarding Pelz's performance were points Weaver raised in the March 18 memorandum.

Second, Lawrence-Miller does not remember having a person-to-person meeting with Weaver and Friedman. The place of the discussion or whether Friedman was present is not a material fact tending to raise a triable issue as to the existence of malice.

(4). *False Exculpatory Statement*

Citing *Donchin v. Guerrero*, *supra*, 34 Cal.App.4th 1832, Pelz contends Lawrence-Miller's deposition testimony creates a triable issue of fact as to her credibility because she denied "having made the accusations, thinking they were true, or even hearing of them from others which Friedman testified came from Lawrence-Miller." What Friedman testified to or attributed to Lawrence-Miller is not relevant to the *Donchin* analysis as to Lawrence-Miller's liability.[8]

Because Pelz did not raise a triable issue of fact to show the existence of malice, the CBS defendants established the defense of the common-interest privilege. Accordingly, summary judgment was properly granted.

---

[8]     We have considered and rejected the remaining arguments Pelz raises in his briefs to attempt to establish a triable issue of fact to show the existence of malice.

DISPOSITION

The judgments are affirmed.  The parties are to bear their own costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**




ALDRICH, J.



We concur:




CROSKEY, Acting P. J.




KITCHING, J.



18